INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS, INC., Govinda Das, on behalf of themselves and all International Society for Krishna Consciousness members, Plaintiffs-Appellees,

v.

James M. ROCHFORD, Superintendent of the Chicago Police Department, William R. Quinlan, Chicago Corporation Counsel, Individually and in their official capacities, and City of Chicago, Defendants-Appellants.

No. 77–1355.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 6, 1977.

Decided Oct. 6, 1978.

Rehearing Denied Nov. 9, 1978.

---

Richard F. Friedman, Asst. Corp. Counsel, Chicago, Ill., for defendants-appellants.

Barry A. Fisher, Beverly Hills, Cal., Edward T. Stein, Singer, Stein & Green, Chicago, Ill., for plaintiffs-appellees.

Before FAIRCHILD, Chief Judge, and SWYGERT and PELL, Circuit Judges.

SWYGERT, Circuit Judge.

This appeal presents First Amendment issues involving regulations promulgated by the Commissioner of the Department of

Aviation of the City of Chicago.[1] The regulations apply to persons distributing literature or soliciting contributions at any of the three municipal airports. The appellants seek reversal of a district court order which found the regulations facially unconstitutional and which enjoined their enforcement. We affirm in part and reverse in part.

After this court's decision in *Chicago Area Military Project v. City of Chicago*, 508 F.2d 921 (7th Cir.), *cert. denied*, 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975),[2] the Commissioner of Aviation, acting under the authority vested in him by the city municipal code, adopted formal regulations for all airports under his jurisdiction. Generally speaking, the regulations require that persons wishing to distribute literature or solicit contributions must register with the airport manager, are restricted to certain public areas, and during declared emergencies must cease their activities.[3]

The regulations became effective March 29, 1976. Thereafter this suit, seeking declaratory and injunctive relief, was filed by the International Society of Krishna Consciousness, Inc. and Govinda Das on behalf of themselves and all Krishna Society members (hereinafter referred to collectively as the Krishna Society). The Krishna Society is a religious organization that requires its members to disseminate and sell its tracts and solicit contributions in public areas. The district court granted the plaintiffs' motion for summary judgment, holding that the regulations were unconstitutional for a variety of reasons.[4] The defendants (hereinafter referred to collectively as the City) appealed.

## I

The City contends that the district court erred in several respects: first, by holding that the regulations are both vague and overbroad and vest too much discretion in the airport officials; second, by failing to consider the manner in which the regulations are being interpreted and administered; and third, by holding that access to administrative or judicial review is necessary. We shall treat each alleged error seriatim.

### A

■ When a statute or regulation is challenged under the due process doctrine of vagueness, a court must look at the enactment from two angles: (1) whether it provides sufficient notice of what may not be done, and (2) whether it contains reasonably clear guidelines so as to prevent official arbitrariness or discrimination in its enforcement. *Smith v. Goguen*, 415 U.S. 566, 573, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Using these principles as a test, we proceed to a consideration of the challenged regulations.

■ Section 1 of the regulations states that "[p]ersons authorized by law to distribute literature, or solicit contributions may do so only in public areas of Chicago airports," but then excludes nine "public areas" along with any area "where persons are in line at or before [the proscribed] areas . . . ." The district court found several deficiencies in this section: first,

---

1. The "Airport Regulations" are reproduced in the Appendix.

2. In *Chicago Area Military Project v. City of Chicago*, 508 F.2d 921 (7th Cir.), *cert. denied*, 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975), we affirmed a district court order enjoining O'Hare International Airport employees from preventing the distribution of literature within the terminal buildings. Prior to the injunction, the employees had been acting pursuant to an oral regulation which prohibited any picketing, distribution of literature, or solicitation of funds. Our opinion contained a suggestion that the City might promulgate suitably restrictive regulations to deal with such activities at the airport.

3. The regulations included additional restrictions which will be noted in the discussion *infra*.

4. *International Society of Krishna Consciousness, Inc. v. Rochford*, 425 F.Supp. 734 (N.D.Ill. 1977).

that the regulations were invalid for failure to specify whether the prohibited public areas referred to are located at Meigs, Midway, or O'Hare airport. We differ with that finding. For example, if one of the prohibited areas is "concourses A through K" and only O'Hare has concourses A through K, then that particular exclusion obviously applies only to O'Hare and not to the other airports.

■ Of more serious concern is the inclusion of the phrase "persons authorized by law" in the regulations. The court below found the words ambiguous. The City contends that the phrase need not be defined in the regulations because its meaning is clear; persons authorized by law are those who take part in protected First Amendment activities.[5] We are unpersuaded. By not explaining who is "authorized by law," the regulations are deficient. Persons of common intelligence would be required to guess at the phrase's meaning and differ as to how the regulations should be enforced. *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). The language implies that there also are persons who are *not* authorized by law to distribute literature or solicit contributions. Yet the regulations contain no guidelines to assist either the person who wishes to determine whether he is authorized by law or the official who is charged with the regulations' enforcement.

■ The problem becomes even more critical when section 1 is viewed in conjunction with the registration requirements of section 2.[6] When considered together, the two sections allow airport officials to exercise discretion in granting or denying a "permit" application on the basis of their interpretation of which persons are "authorized by law" to engage in protected activities.[7] The regulations fail to include the requisite narrowly drawn, reasonable, and definite standards to guide those officials. Under the regulations, this discretionary power vested in the airport officials may therefore operate as a prior restraint on the exercise of First Amendment rights. *Kunz v. New York*, 340 U.S. 290, 294, 71 S.Ct. 312, 95 L.Ed. 280 (1951). Accordingly, section 1 of the regulations is void on its face for vagueness.

■ Several other deficiencies in the regulations noted by the district court warrant discussion. The fact that persons wishing to exercise their First Amendment rights are prohibited from doing so in certain specified otherwise "public areas" does not in and of itself present a problem of constitutional dimension. It is therefore necessary to examine the characteristics of the areas at issue to determine whether they are appropriate areas for the exclusion of First Amendment activities. The proscribed public areas are generally locations in which the airport officials are concerned about security measures (e. g., the hijack, search, and security areas), locations in which travelers become part of a captive audience (e. g., persons in line), or locations in which space is limited (e. g., doorways, escalators). In each instance we believe the City has valid concerns, namely, to expedite the processing of travelers, to maintain a free and orderly flow of traffic, and to

5. The City further contends that the airport officials' continuous practice of permitting registration by all who wish to exercise their First Amendment rights should be viewed as an authoritative interpretation of the words' meaning: that the regulation is not applied to prevent permissible activities. For a discussion of the problems inherent in this argument, *see* section IIB of this opinion.

6. *See* section IB of this opinion for further discussion of the registration requirements.

7. In oral argument before this court, the City admitted two possible interpretations of the phrase: those who have registered and those who are doing what is permissible under the law in general. Our discussion in the text explains the vagueness problem inherent in the latter interpretation. The former interpretation could lead one in circles; those who are authorized by law are those who are registered, but those who may register are those who are authorized by law.

The additional problem of the absence of any provision for administrative or judicial recourse if one is denied the right to register is considered in section III of this opinion.

avoid disruption of normal airport activities. Therefore it is proper to exclude First Amendment activities from the enumerated areas. Such activities could conceivably interfere with the basic purpose of an airport. *See generally Wolin v. Port of New York Authority*, 392 F.2d 83 (2d Cir.), *cert. denied*, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968). We also note that the permissible public areas are not so restricted as to render the Krishna Society's rights meaningless. *Cf. Collin v. Chicago Park District*, 460 F.2d 746, 752 (7th Cir. 1972).

We must also disagree with the district court's conclusion that it is unclear which public areas remain available for First Amendment activities. Public areas are those to which the general public may readily gain admittance. In this case the regulations legitimately exclude certain specified locations. We therefore hold that the exclusion of the enumerated areas from the exercise of First Amendment rights is valid.

### B

Section 2 of the regulations covers the registration requirements. Under subsection A, a person wishing to distribute literature or solicit contributions must register with airport officials. The Krishna Society does not contest the fact that registration with airport officials is required. *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Hynes v. Mayor of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976). Rather it argues that a licensor's discretion must be limited by objective standards which protect the State's interest with the least possible restriction of the licensee's protected rights. One problem inherent in the registration requirement before us has already been discussed, that is, that there are no guidelines to assist officials in determining whether the person desiring to register is someone "authorized by law" to exercise his or her rights.

■ Several other problems warrant discussion. For example, subsection B limits registration to a one-half hour period (9:00 a. m. to 9:30 a. m.). The registration period is simply too limited. Persons wishing to exercise their First Amendment rights may be unable to present themselves during that particular half-hour period. As a result they would be totally precluded from exercising their rights. The City does not attempt to justify this limitation, nor do we think that it would be able to do so. Such a limitation operates as a prior restraint which in many instances may be the equivalent of a total prohibition of the exercise of constitutionally guaranteed rights. It is an impermissible restriction.

■ Subsection B also provides that the airport manager or his authorized representative "shall allot reservations for each day in the sequence each person registers." The district court found this provision unconstitutional because it vested "unbridled discretionary power" in the airport officials. The City argues that the court should have focused on the word "shall," contending that use of that word indicates that it is mandatory for the official to register any person who wishes to do so. The City further argues that no person has been denied the right to register and that the airport authorities have "interpreted the regulation as permitting no discretion to pick and choose among those wishing to use the airport." We think the phrase "allot reservations" at least implies a limitation on the number of persons who may register; it also indicates official discretion to grant or deny permission to register. We therefore find the inclusion of this provision to be constitutionally impermissible.

### C

Section 3 of the regulations contains several provisions which were held unconstitutional by the district court and which also warrant discussion. Subsection A provides that only a concessionaire or lessee may sell for "commercial purposes." Subsection B provided that "[n]o person shall make a noise or create other disturbances which interferes with the ability of others to hear public announcements or interferes with the transaction of business with airlines, concessionaires, or lessees." Subsection C

provides that "[n]o person shall interfere with the free passage to, or access of, other persons to corridors, entrances, doorways, or offices of airport facilities." Subsection D provides that "[n]o individual shall be solicited by more than one person at a time." And finally, Subsection E prohibits the erection of a table, chair, or other structure in areas other than leased space.

▉▉▉ The district court focused on the language used to state these limitations. Because a regulation which restricts the exercise of First Amendment freedoms bears a heavy presumption against its validity, we agree with the district court and focus our concern on the question of vagueness. With the exception of subsection E, the provisions are not drafted in a manner sufficiently precise to avoid the possibility of improper application by officials. Additionally, the "chilling effect" which may result from the mere existence of these provisions is sufficient to justify invalidation. Their meaning is too indefinite.

▉▉▉ The sale of religious literature is clearly a protected activity, *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); yet subsection A could be viewed as prohibiting the sale of a religious tract for "commercial purposes" either by the one wishing to sell or by the official charged with enforcement. Subsection B's prohibition against "noise" which interferes with the ability of others to hear announcements or transact business is precise enough in meaning to avoid the problem of vagueness. The subsection also prohibits "disturbances" which interfere in the same manner. This term, however, is too imprecise and is therefore impermissible.

▉▉▉ The City argues that we should consider the manner in which the regulations have been applied, and that only interfering conduct and not protected First Amendment rights would be subject to these prohibitions. The argument is rejected because it is "no answer [to an allegation that an enactment is void for vagueness] to say that the statute would not be applied in such a case." *Keyishian v. Board of Re-*

*gents*, 385 U.S. 589, 599, 87 S.Ct. 675, 681, 17 L.Ed.2d 629 (1967).

▉▉▉ On the other hand, subsections D and E are not vague, yet D presents a different constitutional problem. Subsection D prohibits solicitation by more than one person at a time. Although we think the meaning to be clear, we hold the prohibition void as an invalid restraint of guaranteed rights. The Krishna Society has not challenged subsection E. Because this section does not facially restrict the exercise of guaranteed rights, we do not find it is constitutionally impermissible.

### D

The last section of the regulations, section 4, provides that the airport manager or his authorized representative may declare an emergency because of unusually congested conditions or the necessity of taking emergency security measures. If an emergency is declared, all those distributing literature or soliciting contributions must cease their activities for the duration of the emergency.

▉▉▉ In holding this provision constitutionally infirm, the district court found that the terms were "uncertain in meaning" and "devoid of guiding standards." The court reasoned that this meant that too much discretion was vested in the airport official whose action could result in an invalid restriction of First Amendment freedoms. The City argues that the terms of the provision are not vague, and that if there is unusual congestion or an emergency security situation, those charged with the responsibility of operating the airport must have flexibility to insure the public safety and welfare. We agree and find the provision to be sufficiently narrow and definite to be a permissible limitation on First Amendment activities. This provision is not vague. Persons of common intelligence would not have to guess at its meaning. Section 4 clearly states that all First Amendment activities may be stopped only if warranted by security problems or unusual congestion. The section also includes a clearly limited period for cessation of such activities.

■ The Krishna Society correctly notes that the emergency closure provision applies only to those exercising their First Amendment rights, but it fails to mention the established practice of also stopping all construction projects, tours of the airport, and other "unnecessary" activities during "emergency periods." Although First Amendment freedoms are precious and must be jealously guarded, they may be subject to restriction if necessary to further important governmental interests. *Cox v. Louisiana*, 379 U.S. 559, 562–64, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). Public safety and welfare as well as efficient operation of the airport are clearly important interests. *Cf. Wolin v. Port of New York Authority*, 392 F.2d 83 (2d Cir.), *cert. denied*, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968). The restriction of activities lasts only for the duration of the emergency and is narrowly enough drawn to allow the airport authorities to carry on their business with the least possible restriction of constitutionally guaranteed rights. Accordingly, we hold that the district court erred in voiding the emergency closure provision.

While we have held unconstitutionally vague certain of the provisions of the present regulations, we note that the primary purpose of airport facilities, and of O'Hare in particular, is the handling of an exceedingly heavy flow of traffic. Uncontrolled exercise of free expression could materially diminish the State's substantial interest in accomplishment of the facility's purpose. Therefore we do not mean to suggest that no regulations could be adequately drawn to protect the State's substantial interests. *See Chicago Area Military Project, supra*, at 926.

## II

The City next contends that the trial court erred by failing to take into account the manner in which the regulations were interpreted and administered. They argue that even if the regulations appear to be unconstitutional, the manner in which they were being administered saves them from being constitutionally impermissible. The Supreme Court has held that a court should consider the administrative interpretation of a challenged regulation when the meaning of the language is in doubt. *See, e. g., Power Reactor Development Co. v. International Union*, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945). None of these cases, however, arose in the context of a First Amendment challenge. Whenever a prior restraint impinges upon First Amendment rights, it carries a heavy presumption against constitutional validity. *Bantam Books v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1968). The City has failed to enumerate an established policy which would eliminate the infirmities of both vagueness and the absence of due process. *See generally Hynes v. Mayor of Oradell*, 425 U.S. at 622–23 n. 6, 96 S.Ct. 1755. We therefore reject the City's argument.

## III

■ Licensing arrangements which impinge upon the free exercise of First Amendment rights must provide strict procedural safeguards, *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), and the absence of any provision either for administrative or judicial review of a denial or revocation of registration is of most serious consequence. The district court held that the absence of these safeguards meant that the regulations were facially unconstitutional.

■ The City contends that the regulations here are different from those which have been held to require the inclusion of procedural safeguards and, therefore, the safeguards are unnecessary. It first argues that the registration requirement is a simple, nondiscretionary, and explicit standard which grants no discretion to the airport officials; thus, in the absence of an exercise of discretion, no review is required. We have already rejected the idea that under the regulations no denial of registration could occur. When the regulations are read as a whole, we find that the possibility of

denial of registration exists. It therefore follows that some mode of review must be included. Even if the officials had no discretion in administering these regulations, due process would still require the inclusion of procedural safeguards. In their brief, the City states that "[o]nly if a person refuses to supply the requested information [name, address, organization, and terminal in which he will be] may he be denied permission" to register. If a regulation has the potential to impinge upon First Amendment rights, that regulation must provide for procedural due process. We have previously noted that section 3 includes language which permits the exercise of discretion by airport officials. This is particularly true of subsections B and C which deal with "interference." Such provisions clearly mean that airport officials could revoke a person's registration. Therefore, procedural safeguards are required and the failure to include them is impermissible under the Due Process Clause.

█ The City also argues that because the regulations do not prohibit all advocacy of the Krishna Society's views, judicial review is unnecessary. It suggests that any denial of use of the airport facilities would not prevent the Krishna Society from presenting its views anywhere else in Chicago or even on the sidewalks outside the airport terminals. This type of argument has been soundly rejected. In *Schneider v. New Jersey*, 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939), the Supreme Court held that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." The public areas of the airport are appropriate places in which to exercise First Amendment rights, *Chicago Area Military Project v. City of Chicago*, 508 F.2d at 925, and, in fact, are particularly desirable to those who wish to exercise their rights because of the unique quality of a very high turnover of people in the airport.

## IV

█ In sum, a reading of the Airport Regulations demonstrates that several of the provisions unconstitutionally impinge upon the exercise of First Amendment rights. Although a registration requirement may be permissible, the vagueness of this particular requirement and the unreasonable limitation on the opportunity to register renders it void. Prompt notice and review proceedings must be included in the regulations themselves.

The judgment of the district court is affirmed in part and reversed in part. The cause is remanded for a modification of the preliminary injunction to conform with this opinion.

## APPENDIX

### AIRPORT REGULATIONS DEPARTMENT OF AVIATION

Pursuant to the authority vested in the Commissioner of the Department of Aviation of the City of Chicago by Chapter 8.2 of the Municipal Code of the City of Chicago, and in order to balance the rights of the traveling public and those who have a right to be in public places to publicize their views, the following regulations are adopted, to be effective immediately. These regulations are intended to accomplish goals of:

—assuring fair use of facilities in Chicago's airports by passengers and persons accompanying them, employees, lessees, and persons and groups wishing to publicize their views;

—preventing interference with the right of passengers to free access to the airport travel facilities and the free passage among those facilities;

—discouraging interference with persons who are required to wait in lines;

—preventing interference with hijack and other security measures;

—permitting equitable access among persons and groups desiring to publicize their views.

### 1.

Persons authorized by law to distribute literature, or solicit contributions may do so

APPENDIX—Continued

only in public areas of Chicago airports, provided that they may not do so in the following areas:

A. All aircraft departure lounges and concourses leading to them including concourses A through K;

B. All concourses leading to the terminal buildings including the rotunda;

C. At, in, at the entrance to, or exit from:

(1) hijack, search, and security areas;

(2) ticket counters;

(3) baggage pickup or collection areas;

(4) washroom areas;

(5) areas leased to concessionaries [*sic*] and other lessees except by permission of such lessee;

(6) elevators, escalators, moving walkways; and

(7) main terminal doors and vestibules.

D. At locations where persons are in line at or before areas described in subparagraph C.

2.

A. No person shall distribute literature or solicit contributions unless he shall have registered beforehand with the airport manager or his authorized representative for each day such activities are engaged in.

B. Between 9 a. m. to 9:30 a. m. each day each person who desires to distribute literature or solicit contributions shall register in person with the airport manager or his authorized representative, who shall allot reservations for each day in the sequence each person registers. Each person shall give his name and address as well as the organization or purpose he represents and the terminal in which he will be on that day.

C. Each person registered shall receive from the airport manager or his authorized representative a badge or insignia in a form prescribed by the airport manager. Such badge or insignia shall be valid only for the day issued. It shall be worn at all times

by the bearer while at the airport, and in a manner visible to the public. It shall not be transferred to another person, and shall be destroyed by the bearer when he leaves the airport at the end of the day.

3.

A. No person except concessionaires and other lessees as permitted by contract with the City of Chicago shall sell anything for commercial purposes.

B. No person shall make a noise or create other disturbances which interferes with the ability of others to hear public announcements or interferes with the transaction of business with airlines, concessionaires, or lessees.

C. No person shall interfere with the free passage to, or access of, other persons to corridors, entrances, doorways, or offices or airport facilities.

D. No individual shall be solicited by more than one person at a time.

E. No person shall erect a table, chair, or other structure other than in the leased space.

4.

The airport manager or his authorized representative may declare an emergency on account of unusually congested conditions in the airport terminals caused by weather, schedule interruptions, extremely heavy traffic movements or other causes, or on account of emergency security measures. In such case an announcement shall be made. All persons distributing literature or soliciting contributions as permitted under paragraph I and II shall immediately cease such activities for the duration of such emergency.