David **GAIBIS**, Charles Lowry, and all others similarly situated, Plaintiffs,

v.

**WERNER CONTINENTAL, INC., Defendants.**

Civ. A. No. 78–1211.

United States District Court, W.D. Pennsylvania.

June 14, 1983.

---

Paul Boas, Berlin, Boas, & Isaacson, Pittsburgh, Pa., for plaintiffs.

Francis Milone, Morgan, Lewis, & Bockius, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

SIMMONS, District Judge.

Plaintiffs David Gaibis and Charles Lowry and all others similarly situated are or were employed as over-the-road drivers by Werner Continental, Inc. at its West Middlesex, Pennsylvania terminal. Defendant Werner Continental, Inc., is an ICC certified freight carrier engaged in interstate commerce. Werner was acquired on January 1, 1979, by Hall's Motor Transit Company, another certified interstate carrier. Plaintiffs commenced this action pursuant to the provisions of Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, et seq., and the Fair Labor Standards Act, 29 U.S.C. § 216, seeking to: 1) set aside and vacate three grievance awards, 2) enjoin the defendant from requiring its drivers to comply with the current dispatch and logging procedure under the threat of discipline, and 3) have plaintiffs compensated for all lost wages and damages suffered due to defendant's illegal dispatch procedures.

On April 27, 1981, this Court entered an order requesting the assistance and input of the Bureau of Motor Carrier Safety, Dept. of Transportation (BMCS) in resolving the issues raised in this litigation. The Court determined that the BMCS had primary jurisdiction with respect to the issues of transportation practice and policy involved in the pending civil action and certified the following question for investigation and resolution in accordance with its rules of practice and procedure:

Whether the dispatch and logging procedure followed by Hall's Motor Transit Company for its over-the-road drivers at

its West Middlesex, Pennsylvania terminal violates the Federal Motor Carrier Safety Regulations, 49 C.F.R., § 390.1, et seq.

The matter is now before this Court after having been presented to an administrative law judge, who after considering the arguments of counsel and the evidence presented, entered findings of fact and conclusions of law. A reviewing official, namely, the Associate Administrator for Safety of the Federal Highway Administration in the Department of Transportation, then rendered a final decision. The court previously entered an order directing that the pending motion of Defendant Werner Continental, Inc. to Dismiss Plaintiffs' Second Amended Complaint, be treated as a Motion for Summary Judgment pursuant to Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure. After argument by counsel before this Court, and the Court's review of the briefs submitted, the transcripts of the administrative proceedings, the Recommended Decision of the Administrative Law Judge and the Final Decision of the Associate Administrator, the Court will adopt the administrative law judge's finding of facts with minor changes and will make its own conclusions of law.

## FINDINGS OF FACT

Plaintiff David Gaibis and Charles Lowry are individuals employed as over-the-road drivers by Defendant Werner Continental, Inc., at its West Middlesex, Pennsylvania terminal. The Plaintiffs at all relevant times have been members of Teamsters Local Union 261 (hereinafter the Union), a labor organization which has been the exclusive bargaining agent of the Plaintiffs in their employment relationship with Defendant Company in its operation at West Middlesex, Pennsylvania. The collective bargaining relationship between the Defendant and the Union was governed during the period from April 1, 1976 to March 31, 1979 by the National Master Freight Agreement and Teamsters Joint Council No. 40 over-the-road supplement agreement (hereinafter "NMFA").

Defendant Werner Continental, Inc., a trucking company certified by the Inter-state Commerce Commission as an interstate common carrier of general commodity cargo, was acquired on January 1, 1979, by Hall's Motor Transit Company, another certified interstate carrier. During the entire period from 1975 to date, Werner Continental, Inc., and its successor, Hall's Motor Transit Company, operated a truck terminal in West Middlesex, Pennsylvania. The combined trucking companies will be referred to hereafter as "Hall's." Any reference to "Hall's" may be taken to include the operations of Werner Continental, Inc. prior to January 1, 1979, unless otherwise specified.

Freight loads are dispatched from West Middlesex, day and night, on a sporadic basis reflecting the competition which exists among truckers to provide a fast and reliable service despite an unpredictable demand. Since Hall's operation requires that a driver be available to take to the road as soon as a load to a specific location materializes, over-the-road truck driving from the West Middlesex terminal is not a 9 to 5 job with a fixed starting and quitting time.

The dispatch of the over-the-road drivers by Hall's from West Middlesex is governed not only by the nature of the trucking business, but also by the requirements of federal safety regulations which regulate the driving hours and the rest periods of interstate road drivers. These federal safety regulations, known as the Federal Motor Carrier Safety Regulations (hereinafter sometimes referred to as "FMCSR" with citation to §§ 395 to 395.13 of 49 CFR), were promulgated by the Federal Highway Administration (hereinafter "FHA") of the Department of Transportation, and are administered by FHA's Bureau of Motor Carrier Safety (hereinafter "BMCS").

Under the regulations pertaining to the hours of service of interstate road drivers, FMCSR §§ 395.1 to 395.13, the drivers are required to maintain an hour-by-hour log for every day of the year, whether they are working or not. In this log, the driver's time must be attributed to one of the following functions that would be relevant in this case:

**1542**

"Off-duty time"—when the driver is not on duty, not required to be in readiness for work, and not under any responsibility for performing work.

"Driving time"—the time when a driver is at the driving controls of a motor vehicle in operation.

"On-duty not driving"—all time other than driving time from the time a driver begins to work or is required to be in readiness for work until he is relieved from work and responsibility for performing work.

The significance of the daily log derives from the requirement in FMCSR § 395.-3(a)(1) and (2) that a driver must be given eight consecutive hours of off-duty time. Moreover, according to FMCSR § 395.3(b), a driver is not permitted to be on duty more than a total of 60 hours in any seven consecutive day period, or more than 70 hours in any eight consecutive day period. Because of this regulation, it is of crucial importance how drivers log their off duty time. If off duty time is improperly logged as either "on duty" or "on duty not driving" then the trucking company and the drivers almost certainly would be in violation of the regulations since drivers who have been on duty too long would have been illegally dispatched. Finally, FMCSR § 395.8(a) provides that a driver who incorrectly logs his time is subject to criminal prosecution, as is a carrier who instructs a driver to log his time improperly.

There is no dispute that Hall's allows West Middlesex drivers a 10 hour rest period (or two hours more than the mandatory rest period) following 10 hours of driving time or 15 hours of on-duty time.

There is also no dispute that after the mandated 10 hour rest period is over and the driver still has at least 22 hours of "on duty" time available, a driver assigned to the West Middlesex terminal is considered to be "in service" and must be available in some form to receive a telephone dispatch call 24 hours a day. Hall's however, has not told its drivers that they must be available personally to receive a telephone dispatch call.

After receipt of a telephone dispatch call, the industry-wide collective bargaining agreement and the company's work rules provide that a driver must report to the West Middlesex terminal within two hours.

Drivers at the West Middlesex terminal are directed by Hall's to log the time while they are awaiting a telephone dispatch call as "off-duty". They are not paid for this time, and drivers who have attempted to log the waiting period as "on-duty not driving" have been warned about possible discipline, or actually have been disciplined by the company.

As long as a driver has enough driving hours available, the telephone dispatch call from the West Middlesex terminal may come at any time during the waiting period, and is unpredictable because of the nature of the demand for freight services. The driver may receive a call immediately after his 10 hour rest period ends, several days after his rest period ends, or at any time in between.

Further contributing to the unpredictability of the telephone dispatch call is the "hog" seniority system imposed by the industry-wide collective bargaining agreement. Under this system the driver with the most seniority, and possessing the necessary "off duty" hours, receives the next dispatch call irrespective of the time of his last call. It is possible, therefore, for a high seniority driver to get two or more dispatches before a driver at the bottom of the seniority list receives one.

The priority rights of "foreign" drivers is another factor contributing to the unpredictability of the telephone dispatch system. Under the concept of "foreign power courtesy," a driver from another Hall's terminal who has delivered a load to West Middlesex, is dispatched before any drivers domiciled at West Middlesex.

Because of the unpredictability of the telephone dispatch system, Hall's requires a high level of driver availability during the waiting period. "Log audit cards" are maintained by dispatchers at West Middlesex to record all incidents of driver non-availability. The audit card of a driver who is supposed to be available after the mandatory rest period is marked "busy" or "no

answer" if the dispatcher fails to get through, and "absent" or "not home" or "not home will call" if someone other than the driver answers the phone, but that person does not affirmatively accept a dispatch call on behalf of the driver.

The discipline imposed for any of the forms of missed telephone dispatch calls varies with the frequency and severity of the incidents. Missed dispatch calls are treated cumulatively, and a history of busy signals, no answers, driver non-availability when a call is completed, failure by a third party to accept a dispatch call, or failure to report to the terminal within two hours of receiving a dispatch, leads to progressively more severe forms of discipline. The forms of discipline begin with a letter of reprimand, then a suspension, then a threat of dismissal, and culminating, finally, in actual dismissal in the case of "chronic and habitual absenteeism."

"Chronic and habitual absenteeism" as grounds for dismissal is sanctioned by the industry-wide collective bargaining agreement and represents an accumulation of incidents of busy phone lines, no answers, driver non-availability if there is an answer, or failure by an answering third party to accept a dispatch on behalf of driver. If a driver believes he has been unfairly disciplined or that the charge of "chronic and habitual absenteeism" is groundless, he may invoke the grievance procedure of the industry-wide collective bargaining agreement.

Even apart from company-imposed discipline for missed telephone calls, there are strong economic incentives for drivers not to miss dispatches. Compensation and vacation time are tied to the number of "runs" a driver makes, with the result that a missed dispatch can be costly.

The unpredictability of the dispatch call and the two-hour reporting deadline, combined with the economic incentives which drivers have for not missing telephone dispatches, as well as the threat of discipline (and incidents of actual discipline) which follow missed telephone dispatch calls, tend to keep West Middlesex drivers close to their home telephones during the period when they are supposed to be available. Most drivers inform the dispatchers that they are to be reached at their home phones, and in fact most dispatch calls are received personally by the drivers at their home telephones.

One possible alternative to constant driver availability alongside the home telephone is for the driver to attempt to determine in advance when a dispatch call will come. The record shows that such driver-initiated dispatch inquiries are ineffective in freeing drivers from their home telephones because dispatchers are unable to predict when a load will be available for a particular driver.

Another alternative to personal availability alongside the home telephone—the use of secondary telephone contact points—does not permit drivers to pursue freely ordinary leisure time activity during the period when they are supposed to be available. To illustrate, a driver may want to use his off-duty time for a trip to a camping site where there are no telephones, or to see a movie or to eat at a fast-food restaurant where he cannot easily be paged. Or the driver may want to visit a regional shopping center where the use of multiple contact points is not feasible. Thus as a practical matter, the most that recourse to a secondary contact point means is that a driver may select one other phone to which he is tied, but the secondary contact point, like the primary contact point at home, must be within two hours distance of the West Middlesex terminal.

Hall's has not interferred with or discouraged the use of driver initiated dispatch inquiries or secondary contact points.

Apart from driver initiated dispatch inquiries and the use of secondary contact points, the only other viable alternative to personal telephone availability identified on the record is the use of third party dispatches—that is, the acceptance of a dispatch by someone other than the driver. The availability and/or lack of availability of a third party dispatch procedure at West Middlesex was the main point of contention during the administrative hearings.

The record shows that Hall's does nothing positive to encourage the use of third party dispatches at the West Middlesex terminal. The only statement of company policy which relates to third party dispatches appears in a company bulletin dated August 5, 1975:

If, for any reason, a driver is not going to be at the place normally called by the company when work is available, and no one else is available at that place to accept a work call for that driver, the driver is required to so notify the company so that, if a load does materialize, the driver can be reached and offered work.

Hall's interprets the August 5, 1975 policy statement as meaning that unless a third party specifically asks for a dispatch, and affirmatively represents that he or she is authorized to accept the dispatch, a third party dispatch will not be given, and the call will simply be recorded on the log audit card as showing that the driver was not available. Other trucking firms do not require the invocation of specific formulas before third party dispatches are given; the drivers merely inform these other companies once of the names of adult persons authorized to receive dispatches.

Neither the terms of the August 5, 1975 policy statement nor the interpretation of the policy statement are well known to the West Middlesex drivers or the members of the driver's family who would be the most likely recipients of those calls. Hall's third party dispatch procedure does not appear in the company's work rules nor do they appear in written dispatch instructions given to dispatchers although it is the practice of other carriers to have a written explanation of third party dispatch procedures.

The three dispatchers that testified concerning Hall's dispatch procedures were William Bullano, Edward Boyle, and Mary Kathryn Ebersole. Although each testified that they had given dispatches to a third party, there was no one consistent method employed in making the third party dispatches. Dispatcher William Bullano testified that he gave dispatch information to third parties only if the third party indicated that immediate contact with the driver could be made for the purpose of informing the drivers to call Bullano. Upon promptly receiving a return call, Bullano would then given the dispatch to the driver.

Dispatcher Mary Kathryn Ebersole did not require that a third party specifically ask for the dispatch, but would not give the dispatch to a third party, even if it were asked for, unless that person could tell her where the driver was and when he would return, thereby assuring her that the driver would report to the terminal within the two-hour deadline. To Ebersole, who worked the night shift, a typical third party dispatch was an instance when the driver was asleep, the wife answered the phone, and Ebersole told her to wake her husband and send him to the terminal for a load. Dispatcher Edward Boyle would only give third party dispatches if the person answering the telephone on behalf of the driver affirmatively requested that the dispatch be given. According to Boyle, third party dispatches were given infrequently.

The testimony of Louis Caccia, an employee of Hall's with twenty-one years of service, (11 of which have been spent at West Middlesex, and presently the shop steward at West Middlesex) shows that Hall's did not have a viable third party dispatch system. Caccia was called as a witness by Hall during the administrative hearings. Based upon the administrative law judge's observation of Caccia's demeanor, this Court adopts his findings that Caccia's testimony is entitled to a high degree of credibility. Caccia testified that he never received a third party dispatch; that the language of Hall's August 5, 1979 bulletin (i.e., the reference to someone else being "available . . . to accept a work call for (the) driver") does not indicate anything to him about a third party dispatch system; and that in his view Hall's does not have a third party dispatch system. As shop steward, however, Caccia never made any suggestion to Hall's management respecting third party dispatches, because, as he put it—

Well, until recently, I never heard much about third party, which has been men-

tioned a few times. I never used to ... I never known of anybody else that used it, unless just recently I heard them talk of it.

Since the dispatch call to the road driver may come at any time after the mandated rest period, the unpredictability inherent in the telephone dispatch system tends to produce driver fatigue. This is demonstrated by the fact that a driver may spend an entire evening waiting for a call from the dispatcher, then go to sleep only to be awakened soon afterward by the dispatcher. *The evidence is overwhelming that the unpredictable telephone dispatch system used by Hall's inevitably results in the dispatch of fatigued drivers.* (Emphasis supplied)

Further contributing to the fatigue problem, is Hall's work rule which provides that road drivers at West Middlesex are not permitted to "book-off" (i.e., remove themselves from the dispatch roll) at the time of receiving a dispatch call by reason of fatigue or for any other reason.

Prior to January 18, 1981, a "book-off" was available on the basis of one 24 hour "book-off" a week, but it had to be requested during the mandated ten hour rest period, and it had to be taken immediately after the rest period was over. The 24-hour "book-off" privilege could be lost if a driver missed a dispatch call or "booked-off" at any other time. In addition to the 24 hour "bookoff", prior to dispatch, a driver could request a "book-off" because of sickness or an emergency, but such a "book-off", too, would mean a loss of the 24 hour privilege.

Since the no "book-off" at dispatch rule has no exception for fatigue, drivers at West Middlesex believe that if they are fatigued at the time of receiving a call but refuse to take a load, this is considered a violation of the company's work rules and the basis of a disciplinary proceeding. This belief is well-founded since drivers have been warned that "book-offs" for fatigue at time of dispatch are a violation of Hall's work and dispatch rules. Because of Hall's no "book-off" at dispatch rule, fatigued road drivers at the West Middlesex terminal do not report that they are fatigued when they receive a dispatch call, and rou-

tinely take dispatches while in this dangerous condition.

On January 18, 1981, new "book-off" rules were formally issued at West Middlesex. Drivers still may not "book-off" at the time of a dispatch call, but with the prior consent of a dispatcher, a driver who is supposed to be available for dispatch may "book-off" in advance of dispatch for brief periods of time because of fatigue or for any other reason. According to Hall's, "book-offs" are not permitted at time of dispatch because the carrier claims that it might be accused by the union or its employees of playing "position" for favored runs. That is to say, if a driver could "book-off" at will, this device might be used to pick and choose the runs that will be accepted and which will be rejected.

Curtis Galloway, Director for Industrial Relations for Hall's, as well as present and former dispatchers, testified that, (a) the company does not knowingly dispatch fatigued drivers, and (b) Hall's would allow a "book-off" if it were reported to the company at time of dispatch that a driver was fatigued. But Galloway admitted that if a driver should report that he was fatigued at the time of a dispatch call, this would be considered a violation of the company's work rules, and might be used against him in a disciplinary proceeding. Moreover, since Galloway acknowledged that the obvious purpose of the rule was to discourage "book-off," and since he further admitted that he knew that driver fatigue was a problem, his statement that he did not know that the inevitable effect of the no "book-off" rule was to discourage drivers from reporting fatigue when called for dispatch is not credible. It is found as a fact that high officials of Hall's must have known that the no "'book-off' at dispatch rule" results in fatigued drivers taking to the road.

Finally, with respect to "book-offs" it should be noted that neither the earlier system (one 24 hour "book-off" at end of the rest period and "book-offs" for emergency and sickness only) nor the January 1, 1981 reforms (unlimited short "book-offs")

lessen the unpredictability of telephone dispatch calls. "Book-offs" of any kind excuse the driver from being available. When the driver is supposed to be available, he is still subject to the unexpected telephone call and the two-hour reporting deadline.

The NMFA contains in Article 45 a grievance and arbitration procedure by which the parties governed by the agreement agreed to resolve all grievances, complaints or disputes by submitting them to that grievance and arbitration procedure.

The grievance procedure of the NMFA provides for the resolution of disputes, which cannot be resolved by the parties themselves, by joint committees composed of representatives of the unions and employers covered by the NMFA. The joint committees referred to in the NMFA are the Western Pennsylvania Joint Area Committee and the Eastern Conference Joint Area Committee (hereinafter "ECJAC"). The ECJAC is a body created by the NMFA and consists of an equal number of Eastern Conference of Teamster delegates and employer-representative delegates.

Article 16 of the NMFA which prohibits employers from requiring employees to violate government regulations in regards to safety, reads in pertinent part, as follows:

Under no circumstances will an employee be required or assigned to engage in any activity involving dangerous conditions of work or danger to person or property or in violation of any applicable statute or court order, or in violation of a government regulation relating to safety of person or equipment. The term 'dangerous conditions of work' does not relate to the type of cargo which is hauled or handled.

The NMFA, therefore has made a violation of federal safety regulations a breach of the contract.

As a result of the dispatch procedures employed by Hall's, Plaintiff Gaibis, in his capacity as union steward, on November 11, 1977, filed a grievance on behalf of all drivers of Defendant Company at its West Middlesex operation pursuant to the grievance procedure as set forth in Articles 45 and 46 of the NMFA. The grievance in pertinent part is as follows:

Details: For the past six (6) years, up to and including the present time, employee drivers have been required to be constantly 'available or in service on-call' to the Company between loads, immediately following the completion of the federal required statutory 8 hour 'off-duty' rest period, at the risk of discipline. These employee drivers have been, in addition, required to log this time as off duty, when in reality, and pursuant to federal laws and regulations, this time should be logged as 'on duty not driving' and should be compensibe (sic). This is true because the drivers are literally required to be immediately available and must wait for work calls.

Adjustment Requested: Regulate work week, or do not require availability, or permit this time to be compensible. In addition, employees request back pay for all past time which they were required to log as off duty, when in fact they were 'in service on duty not driving.'

The grievance was processed at a meeting of the Western Pennsylvania Teamsters and Employers Joint Area Committee and the result was a deadlock, thus causing an appeal to be taken to the "ECJAC." The grievance was heard before the ECJAC on April 26, 1978, case no. R–90–78, at which time the Defendant Hall's claimed the case was improperly before the committee as it was not subject to the grievance procedure and unrelated to the contract. Approximately one week later, on or about the early part of May, 1978, Plaintiff was notified that the ECJAC had sustained the company's position and dismissed the grievance by making the following decision:

"The panel in executive session, motion made, seconded and carried this case is improper (sic) before this Committee. No cost."

On or about January 4, 1978, a letter was sent to Plaintiff Lowry from Defendant Hall's suspending him for three days without pay for being "unavailable for dispatch", because he was not home on several occasions when he was "off duty" and called by Defendant Hall's. On or about

January 10, 1978, a grievance was filed by Plaintiff Lowry charging that his suspension for "non-availability" was illegal and improper. After a deadlock on said grievance before the W. Pa. Teamsters & Employers Joint Area Committee, the grievance was appealed to the ECJAC.

The grievance was heard before the ECJAC on July 25, 1978, case no. R–90–78 and approximately one week later, Plaintiff Lowry was informed that the ECJAC had upheld his suspension with the following decision:

"The panel in executive session, motion made, seconded and carried that based on the fact that Lowry was suspended for just cause, the claim of the union is denied. Cost to union."

On or about January 29, 1979, Plaintiff Lowry was discharged by the Defendant Company for "chronic and habitual absenteeism." A grievance was filed by the Union and subsequently decided by the Western Pennsylvania Teamsters and Employers Joint Area Committee (hereinafter WPTEJAC) on February 15, 1979, reinstating Plaintiff Lowry without back pay, and ordering the Defendant Company and the Union to settle the method of notifying the drivers of work opportunities.

On or about March 1, 1979, the Defendant Hall's in less than two weeks after Plaintiff Lowry was ordered reinstated, again discharged Lowry for "chronic and habitual absenteeism" based on a five or six day period of time. As a result of the March 1, 1979 discharge of Plaintiff Lowry for non-availability, the Defendant Company and the Union once again went through the grievance procedure and again, on August 29, 1979, the arbitrator ordered Plaintiff Lowry reinstated but without back pay.

On or about December 7, 1979, the Plaintiff Lowry received a letter from the Defendant Company dated December 4, 1979, informing him that once again he was being discharged for not being by his phone while "off duty" or "chronic and habitual absenteeism" as the Defendant Company called it.

On January 11, 1980, an arbitration hearing was held on the most recent discharge of Plaintiff Lowry and on January 14, 1980, the arbitrator issued an opinion upholding the discharge.

Plaintiff David Gaibis was notified by Hall's on May 2, 1980, that he was being discharged for chronic and habitual absenteeism. This "chronic and habitual absenteeism", as has been the case on all other occasions when this phrase has been used relative to the matters raised herein, relates solely to "off duty" time.

A grievance was filed by the union on behalf of Plaintiff Gaibis on May 7, 1980, challenging his discharge as being illegal and in violation of the collective bargaining agreement. A hearing was held on the same date before the "WPTEJAC" at which time the discharge was upheld, without opinion.

Both of the named Plaintiffs, Gaibis and Lowry, were discharged as a result of the same alleged illegal dispatch procedure challenged in their Complaint. Other employees of Defendant Hall's who are similarly situated as Plaintiff Gaibis and Plaintiff Lowry, have been and continue to be suspended for alleged "non-availability" or "chronic and habitual absenteeism."

As a result of the discipline and threats of discipline by Defendant Hall's, Plaintiffs and others similarly situated were, in most cases, forced to remain home and be continuously and absolutely available for dispatch calls from the Defendant Hall's having no idea when the calls might come. Plaintiffs and others similarly situated logged said time as off duty only because Defendant Hall's required them to so log the time at the risk of discipline.

## DISCUSSION AND CONCLUSIONS

### Logging and Dispatch Procedure

In certifying the question related to the transportation issues in this litigation the court's objective was to gain the benefit of the BMCS's views before rendering a final judicial decision. The primary jurisdiction doctrine allows the court, where a claim is originally cognizable, to stay the proceedings before it, maintain jurisdiction

and certify the relevant issues to an administrative agency with special competence so the court may avail itself of the agency's expertise. *Driving Force, Inc. v. Manpower, Inc.*, 538 F.Supp. 57 (D.C.Pa.1982); *Levitch v. Columbia Broadcasting System, Inc.*, 495 F.Supp. 649 (S.D.N.Y.1980).

This Court never relinquished its jurisdiction in this matter, and so stated in its Order of April 27, 1981, that certified the question to the administrative agency. By invoking the primary jurisdiction doctrine this Court will now be able to take full advantage of the BMCS's expertise in reaching a final decision.

■ While the Court recognizes that the BMCS and its reviewing officials have special competence in matters pertaining to the regulation of the trucking industry, this court is not bound by the decisions rendered as a result of the administrative process. There being no material factual disputes between the parties, the sole contention is the construction of the BMCS regulations as they pertain to the road drivers computation of their hours of service.

■ It is clear that when a decision turns on the meaning or construction of words in a statute or regulation, as in this case, then a legal question is presented for the court to decide. *International Society for Krishna Consciousness, Inc. v. Rochford*, 425 F.Supp. 734 (N.D.Ill.1977), *aff'd in part, reversed in part* 585 F.2d 263 (7th Cir.1978).

■ Accordingly, this court, though mindful of the beneficial views of the administrative agency, has the duty to construe the BMCS regulations in making a final decision, and is not bound by the decisions rendered through the administrative process. At most the court is required to give what it deems to be "appropriate weight" to the decisions rendered by the BMCS and its reviewing officials. *International Ass'n of Heat and Frost Insulators and Asbestos Workers v. United Contractors Association*, 483 F.2d 384 (3rd Cir.1973), amended, 494 F.2d 1353 (3rd Cir.1974).

■ As the Supreme Court directed in *Bread Political Action Committee v. Federal Election Commission*, 455 U.S. 577, 102 S.Ct. 1235, 71 L.Ed.2d 432 (1982), a court must begin its analysis of an issue of statutory construction with the plain language of the statute itself. Administrative regulations, for construction purposes, are treated no differently than statutes and the same rules of construction are applicable in both instances. *Rucker v. Wabash Railroad Co.*, 418 F.2d 146 (7th Cir.1969), *New Ikor, Inc. v. McGlennon*, 446 F.Supp. 136 (D.C.Mass. 1978). The plain language of the regulations and the ordinary meanings of the words therein are the starting points in construing the regulations and will be determinative unless there is an apparent ambiguity or expression of legislative intent to the contrary. *Bread Political Action Committee*, 455 U.S. at 580, 102 S.Ct. at 1237.

The regulations in question that the Court must construe defines "on duty" time as it applies to the time spent by road drivers waiting for dispatch calls after the mandatory rest period. Up until the final decision rendered by the Associate Administrator for Safety, (as a result of this Court's request for guidance), on-duty time was defined as "[all] time from the time a driver begins to work or is required to be in readiness to work until the time he is relieved from work and all responsibility for performing work." FMCSR § 395.2(a).

The definition of on duty time contained in the regulation has been interpreted, officially and unofficially, by the FHWA. The official interpretation is contained in the document published in the Federal Register on November 23, 1977, 42 Fed.Reg. 60078, Nov. 23, 1977. The interpretation states:

The purpose of this rule is to allow the driver opportunity to obtain adequate rest. This means that he must be relieved of all responsibility from work and be free to use the time effectively for his own purposes during the specified period of time.

"When a driver is required by a motor carrier to personally stand by to receive a telephone notice to report to work, following a required off duty period, and the driver does in fact stand by, he meets the requirements of § 395.2(a) and such time must be logged as on duty time."

A number of unofficial interpretations have been issued concerning telephone availability. One informal interpretation issued to Mr. Gaibis on September 22, 1977, states that a driver is on duty if the company requires him to personally be present at a particular point with no option to have someone else receive the message for him and no option to change the contact point. A similar interpretation was issued by former Federal Highway Administrator Bowers on July 13, 1979. Mr. Bowers said "[a] driver is not considered to be on duty if a third party may take a message for him, or if he is free to move around, but must keep the carrier notified as to where he can be reached."

On March 29, 1982, the Associate Administrator for Safety issued a new interpretation of the regulation overruling the prior interpretations of the regulation. The new interpretation stated that "[i]f the employer generally requires its drivers to be available for call after a mandatory rest period which complies with the regulatory requirement, the time spent standing by for a work related call, following the required off-duty period, may be properly recorded as off-duty time." The reasoning offered by the Administrator was that since the freedom to rest is the objective purpose of the FMCS regulations, "[t]he fact that a driver must also be available to receive a call in the event the driver is needed at work, even under the threat of discipline for non-availability, does not by itself impair the ability of the driver to use this time for rest."

The plain language of the regulation defining on-duty time expressly includes the factual situation where a driver is "required to be in readiness to work". The official interpretation of the regulation issued in November of 1977, acknowledges that when a driver is personally required to stand by to receive a dispatch call, the driver meets the requirements of being on-duty under the regulation. This interpretation of the regulation comports with the ordinary meaning of the words "in readiness to work". As long as the road driver is personally required to be at a particular site after the mandatory rest period so the dispatcher can contact the driver for a work assignment, the time spent waiting for the dispatch call is on duty time as defined in the FMCSR at § 395.2(a).

■ The unofficial interpretations of the regulation suggest that if the road driver was allowed to change contact points where he/she could receive the dispatch calls, then the time spent waiting would not be considered on-duty time. This Court disagrees with this conclusion because the site where the driver receives the dispatch call does not alter the factual situation of a driver being personally at a contact point waiting for the dispatch call. Where the driver is personally required by the Defendant to stand by at any contact point to receive a dispatch call, he/she is waiting in readiness to work and therefore this time should be logged as on-duty time according to the plain language of the regulation.

Hall's could have employed alternative methods for contacting its road drivers for work assignments rather than have its drivers personally stand-by to receive dispatch calls. A working third party dispatch procedure is such an alternative. The facts in this case establish that Hall's has not adopted an alternative dispatch procedure that is utilized in any systematic or consistent pattern as part of the company's practice or procedure.

■ The evidence presented in the administrative hearings does not support Hall's contention that it had established a working third party dispatch procedure that relieved the road drivers of the responsibility of personally waiting for dispatch calls.

The lack of a viable alternative dispatch procedure, such as the third party dispatch procedure, when combined with Hall's policy of requiring its drivers, under the threat of disciplinary action, to log the time they personally spend waiting for a dispatch call as off duty time amounts to a violation of the FMCSR at 49 CFR § 395.8. Hall's is in violation of 49 CFR § 395.8 because it unlawfully requires its road drivers to improperly log their time as "off duty" when said time should be logged as "on duty". Where the company requires the drivers to personally

wait by the telephone for a dispatch call and the driver does in fact wait for a work call, the time spent waiting must be logged as on duty time for which the driver must be compensated. If the driver is not personally required to stand by to receive the dispatch call, he/she is considered to be relieved from work and relieved of all responsibility for performing work and is free to use the time effectively for his/her own purposes.

This Court must also consider another FMCS regulation, 49 CFR § 392.3, to determine if Hall's dispatch procedures violate the provisions concerning the safe operation of a motor vehicle by the road driver. That regulation prohibits a driver from operating or a motor carrier from requiring or permitting a driver to operate a motor vehicle while the driver's ability or alertness is so impaired through fatigue, illness, or any other cause, as to make it unsafe for him to begin or continue the operation of the motor vehicle. 49 CFR § 392.3. This Court concludes that Hall's has violated FMCS regulation § 392.3 by virtue of its work rule and practice that a driver may not "book off" at the time of dispatch. This Court adopts the reasoning of the Administrative Law Judge, as set forth below, to support its determination that a violation of 49 CFR § 392.3 has occurred.

FMCSR § 392.3 emphatically prohibits the dispatch of fatigued drivers irrespective of the cause and notwithstanding the role which the drivers themselves may play in producing this dangerous condition. The position of BMCS on this point is clear:

Regulations cannot provide a complete solution to the problem of driver fatigue and its effect on safety of operations. The manner in which a driver may spend his time off duty is beyond the scope of the FMCSR, although some of his off-duty activities may tire him as much as any work for his employer. The responsibility is the driver's to assure himself of adequate rest and sleep. Likewise, it is the employer's responsibility to establish and apply effective management techniques to ensure that drivers are not dispatched in a fatigued condition, nor that off duty rest is not routinely disturbed by notifications for reporting for the next tour of duty.

Hall's argues that because the drivers do not report fatigue at time of dispatch, it has no knowledge of this condition, but had the company been properly apprised, "book offs" for fatigue would have been allowed. This argument is not convincing. For one thing, the drivers who appeared in [the administrative] proceeding, whether called by Gaibis and Lowry or Hall's, testified that they do not report their fatigued condition when a dispatch call is received for the very reason that "book offs" at that time for any reason are not allowed. Second, considering the fact that Hall's knew that operator fatigue was a problem, and yet it explicitly warned drivers that "book-off" for this reason at time of dispatch was a violation of the company's work rules, it is fair to conclude that whatever gaps exist in the company's lack of knowledge about specific incidents of fatigue are largely of the company's own making. Besides, even if it were believable that Hall's had no knowledge that fatigued drivers generally were being dispatched (which is contrary to [the] specific finding that high company officials must have known the consequences of its no "book-off" rule), it is significant that FMCSR § 393.3 does not adopt a "knowingly permit" standard—it says "a motor carrier shall not require or permit" the dispatch of a fatigued driver. Since this is a safety regulation, which should be liberally construed, *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 100 S.Ct. 883, 63 L.Ed.2d 154 (1980), "permit" in this context should be read as meaning that the carrier may not create a condition which makes the forbidden conduct possible. This is precisely what Hall's has done with its no "book-off" rule.

In addition to the direct prohibition against permitting fatigued drivers to operate a motor vehicle, FMCSR § 390.32 requires carrier "observance" of all safety rules including § 392.3. Contrary to the standard definition, Hall's defines "observance" to mean closing its eyes and doing nothing about the obvious fatigue problem.

Certainly, it is the exact anti-thesis of a safety regulation for a carrier to establish work rules which arbitrarily assume that drivers will not be fatigued at time of receiving a dispatch and thereby discourages drivers from reporting their true condition should they in fact be fatigued. Finally, "observance" minimally connotes that a carrier knows what apparently every driver in the industry knows—namely, that by prohibiting "book offs" at dispatch time it is permitting fatigued drivers to take to the road.

### Arbitration Awards

At the outset the Court acknowledges the stringent standard of review that limits the Court's role in considering an arbitrator's award. Where the parties have entered into a collective bargaining agreement that adopts arbitration as the method of dispute resolution, as in this case, "it is the arbitrator's construction of the contract which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the Courts have no business overruling it because their interpretation of the contract is different from his." *United Steelworkers of America v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960). The arbitrator in making an award is bound by the terms of the collective bargaining agreement and the award rendered is legitimate only so long as it draws its essence from the agreement. *United Steelworkers of American v. Enterprise, supra; Mobil Oil Corp. v. Independent Oil Workers Union,* 679 F.2d 299 (3rd Cir.1982).

The Third Circuit has further emphasized that the reviewing court is to give great deference to an arbitrator's award and may only disturb the award where there is a manifest disregard of the collective bargaining agreement, totally unsupported by principles of contract construction and the law of the shop. *Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123 (3rd Cir.1969). It is clear that this Court's review of the arbitrator's award is narrow and the award may not be disturbed because this Court would have construed the bargaining agreement in a different manner.

A reviewing Court may under certain circumstances however vacate an arbitration award despite the limited standard of review. The Court in *Ludwig* listed several circumstances that would warrant an arbitrators award being overturned. Two of those circumstances are relevant in this case: First, where the award violates specific command of some law and, second, where the award is inconsistent with public policy. 405 F.2d 1128–1129 n. 27.

In light of this Court's earlier discussion and conclusion that Hall's dispatch and logging procedure violates the FMCSR, as it relates to the proper logging of on-duty time and that said improper logging procedure ignores the fatigued condition of its drivers by encouraging said tired drivers to go out on the road, it necessarily follows that the arbitrator's awards upholding the validity of Hall's dispatch and logging procedure are inconsistent with the government regulations and violate the public policy underlying the regulations. The awards rendered by the arbitrators and challenged by the plaintiffs in this action will be vacated because the awards violate the specific command of the FMCSR and are inconsistent with the public policy of the FMCSR to promote safe and proper use of the highways by road drivers. *Kane Gas Light & Heating Co. v. International Br. of Firemen,* 687 F.2d 673 (3rd Cir.1982).

### STATUTE OF LIMITATIONS

Defendant Hall's contends that the Plaintiffs' claims are barred by the statute of limitations because the original complaint in this civil action was not filed until October 23, 1978, considerably after the applicable three month statute of limitations, 5 P.S. § 173, for actions to vacate an arbitrator's award had expired. The Court concludes that the Plaintiff's claims are not time barred because the October 23, 1978 Complaint was filed within the three month statutory period following the arbitration award dated July 25, 1978, which upheld the suspension of Plaintiff Lowry.

Since the identical issues, i.e., Plaintiffs' challenging the validity of Hall's logging

and dispatch procedure, are involved in each of the arbitration awards in this litigation, the Court can properly adjudicate all of the claims since the Plaintiffs timely filed their complaint seeking to vacate the July 25, 1978 arbitration award before the three months period had expired. Furthermore, both Plaintiffs, Gaibis and Lowry, promptly filed applications for preliminary injunctions invoking this Court's jurisdiction after they were discharged challenging the awards that upheld their terminations under Hall's dispatch and logging procedure. Gaibis filed for a preliminary injunction the same day he received notice of the arbitration award, and Lowry filed for a preliminary injunction within two weeks after he received notice of the award upholding his discharge.

### FAIR LABOR STANDARDS ACT

Plaintiffs have alleged that Defendant Hall's has violated the Fair Labor Standards Act because they and other road drivers similarly situated are not being paid for time spent working for Hall's that is logged as off duty time under the company's logging procedure when such time is in fact on-duty time for which they should be compensated. The Court agrees with the Defendant that the two relevant provisions of the Fair Labor Standards Act that could apply in this action are 29 U.S.C. §§ 206 and 207.

■ Section 206 sets the minimum wages an employer shall pay an employee who in any work week is engaged "in commerce ...." The Plaintiffs' Complaint does not allege that the total weekly wage paid by Hall's fails to meet the minimum weekly requirements provided for under the statute which would be a violation of Section 206. The general statement that Hall's has violated the Fair Labor Standards Act by virtue of its dispatch and logging procedure is not enough to establish a claim for an employers violation of the minimum wages provision of the Act. Plaintiffs have not plead sufficient factual allegations to support their entitlement to relief under Section 206 of the Act. The Plaintiffs have not properly stated a claim under § 206 because they have failed to state with particularity how Hall's has violated the minimum wage provision of the statute.

■ As to Section 207 of the Act, which establishes the maximum number of hours an employee can work, the Plaintiffs cannot properly establish a claim to relief under this section because Defendant Hall's is exempt from the provisions of Section 207. Defendant Hall's is exempt from Section 207 because Plaintiffs are over-the-road drivers subject to maximum hours of service regulations set by the Secretary of Transportation pursuant to the provisions of 49 U.S.C. § 304. *Morris v. McComb,* 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44 (1947); *Brennan v. Schwerman Trucking Co.,* 540 F.2d 1200 (4th Cir.1976), 29 U.S.C. § 213(b)(1).

Plaintiffs cannot, in light of the statutory exemptions, properly state a claim upon which relief can be granted under Section 207 of the Fair Labor Standards Act.

### JUDGMENT AND ORDER

AND NOW, this 6th day of JUNE, 1983, based upon the foregoing findings of fact and conclusions of law, IT IS ORDERED, ADJUDGED and DECREED the following:

1. Defendant's Motion for Summary Judgment is denied except for that part of the Motion which addresses Plaintiffs' claim under the Fair Labor Standards Act. Defendant is granted partial Summary Judgment in that Plaintiffs have failed to properly state a claim upon which relief can be granted under the provisions of the Fair Labor Standards Act.

2. All arbitrator's awards which have heretofore upheld the validity of the Defendant's dispatch and logging procedures as hereinabove discussed are here and now vacated.

3. All arbitrator's awards that have heretofore upheld the discharge of and the disciplining of Plaintiffs Gaibis, Lowry and others similarly situated for "non availability", and/or chronic and habitual absenteeism arising out of the Defendant's rule requiring the Plaintiffs and the Plaintiff-class

 

to be in continuous readiness for work while they are off-duty are here and now vacated.

4. The Defendant is here and now permanently enjoined from requiring the Plaintiffs and the Plaintiff-class to be continuously available for work while they are off duty and especially during the hours required for their proper rest.

5. The Defendant may formulate reasonable rules requiring Plaintiffs and the Plaintiff class to be in continuous readiness for work while waiting for a dispatch under the following conditions:

a) That a driver who is off duty shall not be required to be available for readiness to work until he has had eight consecutive hours of off-duty time, and has "booked on" as being available for work, and

b) That once a driver is "booked on" as being available for service, even though he is not on the Defendant's premises, he shall be paid the applicable hourly rate pursuant to the collective bargaining agreement for all hours spent in continuous readiness for work if at the request of the Defendant employer, the said driver is instructed by the Defendant's dispatcher to stand by until called. When a driver receives a "stand-by" instruction he will log "in service, on duty, not driving".

6. That Plaintiffs and all others similarly situated who have lost time by suspension and/or discharge as hereinabove referred to, shall be compensated for all lost wages that would have been paid to them for on duty time pursuant to the collective bargaining agreement, but for said disciplinary action of Defendant. The Plaintiffs and the Plaintiff-class shall not be paid for the hours heretofore spent off active duty while waiting for a call from the Defendant for a dispatch in service for the reasons set forth in the opinion annexed hereto, and for the further reason that said time due to an obvious lack of a uniform and accurate system of recording, would be impossible to accurately calculate. An award to Plaintiffs for this time lost while waiting to be called in the past, would be at most speculative and conjectural.

7. Defendant is permanently enjoined from disciplining, suspending, and/or discharging any of its drivers including the Plaintiffs and the Plaintiff-class, for "booking off" at the time of dispatch, if, in the opinion of said drivers they are fatigued, ill or otherwise physically unable to safely perform their driving duties. Any "in service on duty not driving time" logged by such driver immediately prior to "booking off" because of fatigue, illness and/or other physical disability shall not be compensable.

8. This Court will entertain within ten (10) days of this date a Petition from the Plaintiffs requesting an award for costs and reasonable attorneys' fees. After Defendant has answered said fees and cost petition within ten days of filing the same, a hearing will be held in regard to said petition on July 11, 1983, at 3:30 o'clock, P.M., E.D.S.T., in Court Room No. 5, United States Post Office and Court House, Pittsburgh, Pennsylvania.