724 F.Supp. 917 (1989)
INTERNATIONAL CAUCUS OF LABOR COMMITTEES and Robert Robinson, Plaintiffs,
v.
METROPOLITAN DADE COUNTY, FLORIDA, R.H. Judy, Director of Operations, Aviation Department of Dade County, Florida, Robert Diaz, Jr., Chief of Terminal Operations, Department of Aviation, Dade County, Florida, Janet Reno, State Attorney, Dade County, Florida, and Bobby Jones, Sheriff, Metropolitan Dade County, Defendants.
No. 85-3575-CIV.
United States District Court, S.D. Florida.
October 17, 1989.
*918 Howard C. Rubin, Dallas, Tex., Linton R. Lovett, Howard, Brawner, Lovett & DePozgay, Miami, Fla., for plaintiffs.
*919 Thomas P. Abbott, Asst. County Atty., Miami, Fla., for defendants, Dade County, Judy, Aviation Dept., Diaz and Jones.
George N. Ayleworth, Police Legal Advisor, Miami, Fla., for defendants, Dade County and Jones.
Shirley A. Walker, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for defendant Reno.

FINAL ORDER OF DISMISSAL
ZLOCH, District Judge.
THIS MATTER is before the Court upon the Plaintiffs, International Caucus of Labor Committees and Robert Robinson's, Motion for Preliminary Injunction (DE 18). An extensive evidentiary hearing was held by the Court. Near the close of said hearing, Defendants moved for consolidation of the hearing for a preliminary injunction with a trial on the merits pursuant to Rule 65(a)(2), Fed.R.Civ.P. Plaintiffs waived their opposition to Defendants' Motion and agreed that the case should be considered on the merits. Furthermore, in a telephonic status conference held thereafter, the parties stated that there was no need to file any further evidence, but the Court nevertheless permitted the parties an additional twenty (20) days to supplement the record if desired, and stated that the Court would consider the issues in thirty (30) days (pp. 4-5, DE 44). The Court has thus given "notice to the parties that their final day in court has come." Hollis v. Itawamba County Loans, 657 F.2d 746, 749 (5th Cir. Unit A 1981) (citation omitted).
Plaintiff, International Caucus of Labor Committees (hereinafter ICLC), is an organization dedicated to promoting policies of international monetary reform, a strong American defense program, the international development of nuclear energy sources, the elimination of the international drug trade and other political issues (DE 1). Plaintiffs promote these policies by selling literature and soliciting contributions. Since 1981, Plaintiffs have attempted to promote these policies at the Miami International Airport (hereinafter MIA), utilizing the designated First Amendment areas.
In the designated First Amendment zones at the MIA, Plaintiffs argue that they should be permitted to set up a small table, solicit donations, take subscriptions and even place a credit card device on the table for those persons wanting to charge their subscription, book or donation (Tr. 5, 115-16, DE 42). The gravamen of their claims, however, focus on the MIA's prohibition of the use of tables and semi-fixed signs in the First Amendment zones, a policy applied to all groups and organizations (Tr. 90, DE 42). The Court notes that this prohibition policy is not explicitly mentioned in the ordinance, but is an unwritten policy. Plaintiffs state that the purpose of the signs is "to amplify in a certain manner of speaking [their] views, [their] message to the public and in certain cases also to make, to distinguish [them] from any other group that may be in the same public forum" (Tr. 11-12, DE 42). They state that the purpose of the card table is to place copies of their books, magazines, and other literature on it for open visual display (Tr. 12, DE 42). Plaintiffs argue that "[w]ithout the table and signs, there is no means by which the public is able to, in passing by, know who [they] are." (Tr. 31-32, DE 42). Notwithstanding any constitutional infirmities, to be discussed infra, the Court finds this statement wholly without merit.
Before addressing Plaintiffs' specific allegations, the Court finds it helpful to first lay the foundation behind the MIA's "no table/signs" policy. George H. Spofford, III, Deputy Director, Dade County Aviation Department, "responsible for the day-to-day coordination and functioning of the Department, the implementation of policy established by the [D]irector, the County Manager and County Commissioners" (Tr. 40-41, DE 42), stated:
The Department made a conscious decision when analyzing the terminal facilities with regard to whether we could proceed as several other airports had with regard to establishing fixed booths offline or allowing those individuals who wish to exercise First Amendment rights having direct interface with the passengers and use[r]s of the terminal. We *920 therefore identified the number of areas, as shown on this exhibit [see picture of Miami International Airport, Second Floor  Terminal Building, attached hereto as Exhibit A], which interject the individual exercising that right into the movement and flow of passengers and by its very nature require that there be no fixed or permanent facilities whether it either be a stack of books or some of the Krishna, I believe, who use baggage carts with books on them. We require them to put them back behind them to get them out of the flow.
(Tr. 42, DE 42). Ronald D. Gunther, Chief of airside operations, Aviation Department, responsible for the safe and efficient facilitation of arriving and departing of domestic and international passengers at the MIA, stated:
Essentially, when we made the decision that free exercise areas would be as close to major passenger flows as possible to allow the various permittees access to the large passenger flows, it was necessary to restrict the policy to ensure that there were no permanent or unmovable or even semi-permanent barriers which would inhibit passenger flows during peak periods which occur daily.
(Tr. 67-68, DE 42).
Plaintiffs attack the constitutionality of the MIA officials' actions and Chapter 25 of the Dade County Code by alleging the following violations: the "no-table" policy violates the First Amendment; the "no-signs" policy violates the First Amendment; Sections 25-2.2(a), 25-2.2(c) and 25-2.2(g) vest too much discretion with the airport officials who enforce these regulations thus violating the First Amendment; Sections 25-2.2(c), 25-2.2(d) and 25-2.7 are void for vagueness; Sections 25-2.2(d), 25-2.7 and 25-2.9 are substantially overbroad; Section 25-2.2(f) restricts the selling of items in violation of the First Amendment; and Chapter 25 of the Dade County Code fails to include the necessary due process procedures and is not rationally related to a valid legislative purpose in violation of the Fourteenth Amendment. Plaintiffs request the Court to declare the aforementioned actions and statutory provisions unconstitutional and to issue a permanent injunction to prevent Defendants from arresting Plaintiffs and others who violate these provisions.
To issue a permanent injunction, the Court must determine whether such actions or statutory provisions violate the Constitution. Plaintiffs must then show that irreparable injury would continue absent an injunction and show that there exists no adequate remedy at law. Newman v. State of Alabama, 683 F.2d 1312, 1319 (11th Cir. 1982), cert. denied, 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 346 (1983).

I. FIRST AMENDMENT VIOLATION
In determining whether the MIA's policy of "no tables/signs" violates the First Amendment of the Constitution, this Court must first decide whether Plaintiffs' use of the tables and signs constitutes speech protected by the First Amendment, for, if it is not, the Court need go no further. Cornelius v. NAACP Legal Defense and Educational Fund, Inc., 473 U.S. 788, 797, 105 S.Ct. 3439, 3446, 87 L.Ed.2d 567 (1985). If protected speech, the Court must determine the nature of the forum and then assess "whether the justifications for exclusion from the relevant forum satisfy the requisite standard." Id. at 797, 105 S.Ct. at 3446.
The law is well settled that the distribution of literature is a type of speech protected by the First Amendment. United States v. Grace, 461 U.S. 171, 176, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983). Similarly, the use of signs to communicate speech has been classified as expressive conduct protected by the First Amendment. Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); Police Dept. of the City of Chicago v. Mosley, 408 U.S. 92, 99, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212 (1972). However, this Court finds that the use of tables is not expressive conduct protected by the First Amendment. See International Society for Krishna Consciousness, Inc. v. Rochford, 585 F.2d 263, 270 (7th Cir.1978) ("Because *921 [Section 3(E), which prohibits the erection of a table, chair, or other structure in areas other than leased space] does not facially restrict the exercise of guaranteed rights, we do not find it is constitutionally impermissible."); International Caucus of Labor Committees v. City of Chicago, 816 F.2d 337, 339 (7th Cir.1987). Nevertheless, the Court, in an abundance of caution, will analyze the MIA's policy of prohibiting tables (non-protected speech) with the MIA's policy of prohibiting fixed or semi-fixed signs (protected speech) in its constitutional analysis herein. This will thus remedy any defect in the event a reviewing court either rejects this Court's reliance on Rochford, 585 F.2d at 270, and City of Chicago, 816 F.2d at 339, or adopts Plaintiffs' argument that the card tables in this context should be given full First Amendment protection in the same manner as newsracks. See Gannett Satellite Information Network, Inc. v. Town of Norwood, 579 F.Supp. 108, 114 (D.Mass.1984).
The right to use government-owned property for public speech is not absolutely protected by the First Amendment. Cornelius, 473 U.S. at 799-800, 105 S.Ct. at 3447-3448. Because the extent of the First Amendment protection varies with the character of the property to which speakers seek access, Id. at 797, 105 S.Ct. at 3446, Plaintiffs' claims must be analyzed under the rubric of the public forum doctrine.
In Perry Education Ass'n v. Perry Local Educators' Ass'n, the United States Supreme Court divided public property into three categories for purposes of First Amendment analysis and discussed the types of forums available for expressive speech. 460 U.S. 37, 45-46, 103 S.Ct. 948, 954-955, 74 L.Ed.2d 794 (1983). At one end of the spectrum the Court placed the traditional public forum: those which "have immemorially been held in trust for the use of the public" and which have customarily been used for purposes of assembly, communication of thoughts and discussion of public questions. Perry, 460 U.S. at 45, 103 S.Ct. at 954 (citations omitted); United States v. Belsky, 799 F.2d 1485, 1488 (11th Cir.1986) ("A public forum is one that `by long tradition or by government fiat [has] been devoted to assembly and debate.'") (citing Perry, 460 U.S. at 45, 103 S.Ct. at 955), reh'g denied, 805 F.2d 1043 (11th Cir.1986). Streets and parks are the paradigmatic examples. Student Coalition For Peace v. Lower Merion School, 776 F.2d 431, 435 (3rd Cir.1985). "As to traditional public forums, such as streets and parks, the government may enforce content-based exclusions only if `necessary to serve a compelling state interest and [if] narrowly drawn to achieve that end,' and may enforce content-neutral, time, place and manner regulations only where they `are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" Belsky, 799 F.2d at 1488 (citing Perry, 460 U.S. at 45, 103 S.Ct. at 955).
A public forum is not only created by the sheer weight of tradition, but may be created by virtue of government designation. Stewart v. District of Columbia Armory Bd., 863 F.2d 1013, 1016 (D.C.Cir.1988) (citing Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449). Thus, the second category of forums consists of public property which the government or state has dedicated primarily as a site for communicative activity. Perry, 460 U.S. at 45, 103 S.Ct. at 954. A designated forum may be so designated for only limited uses or for a limited class of speakers. Id. at n. 7; Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449 (citations omitted). "The touchstone for determining whether government property is a designated public forum is the government's intent in establishing and maintaining the property." Stewart, 863 F.2d at 1016 (citing Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449). Intent is not merely a matter of stated purpose; rather, it is a matter to be inferred from a number of factors. Stewart, 863 F.2d at 1016 (citing Cornelius at 802-803, 105 S.Ct. at 3448-3449). For example, in Cornelius, the Supreme Court looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum. Id. It also examined the nature of the property *922 and its compatibility with expressive activity to discern the government's intent. Stewart, 863 F.2d at 1016-1017 (citing Cornelius at 802-803, 105 S.Ct. at 3448-3449). The Court will not infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity. Cornelius, 473 U.S. at 803, 105 S.Ct. at 3449. Thus, the Cornelius factors require a court to look to the character of the forum in the nature of the property, its compatibility with expressive activity, and the consistent policy and practice of the government. Stewart, 863 F.2d at 1017. As long as the state has opened the character of the facility as a place for expressive conduct, it is bound by the same strict scrutiny protection as properties in the first category (i.e., a traditional public forum). Perry, 460 U.S. at 46, 103 S.Ct. at 955.
Examples of forums which fit into this second category include auditoriums, meeting facilities and theatres. Id. at 45, 103 S.Ct. at 954; see also Cornelius, 473 U.S. at 802-803, 105 S.Ct. at 3448-3449 (Court held that the meeting facilities of a state university, a public school board meeting and a municipal auditorium and city-leased theatre were all intended to be forums for expressive activities by the general public or by a class of speakers); Southeastern Promotions, Ltd. v. City of West Palm Beach, 457 F.2d 1016, 1019 (5th Cir.1972) (a municipal auditorium was a highly appropriate site for First Amendment activities because the essential purpose and character of the municipality's auditorium is the promotion of communication and expression for the benefit of the general citizenry).
The third category, referred to as non-public forums, is defined as "public property which is not by tradition or designation a forum for public communication ...," Perry, 460 U.S. at 46, 103 S.Ct. at 955, and is used for purposes not particularly linked to expression. Cornelius, 473 U.S. at 802, 105 S.Ct. at 3448. The state does not create a public forum every time it creates, operates or sponsors a facility or method of communication. Perry, 460 U.S. at 49 n. 9, 103 S.Ct. at 957 n. 9 (quoting United States Postal Service v. Council of Greenburgh Civic Assn., 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981); Estiverne v. Louisiana State Bar Ass'n, 863 F.2d 371, 376 (5th Cir.1989). The United States Supreme Court stated:
Were we to hold to the contrary, display cases in public hospitals, libraries, office buildings, military compounds and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require.
Lehman v. City of Shaker Heights, 418 U.S. 298, 304, 94 S.Ct. 2714, 2718, 41 L.Ed.2d 770 (1974). Rather, a forum may be considered nonpublic where there is clear evidence that the state did not intend to create a public forum, or where the nature of the property at issue is inconsistent with the expressive activity. Estiverne, 863 F.2d at 376 (citing Cornelius, 473 U.S. at 803, 105 S.Ct. at 3449).
Having outlined the categories of forums established by the United States Supreme Court, the Court will address the nature of the MIA and compare it to these established forums. The Court is well aware that most circuits are in accord that a municipal airport terminal owned and administered by a governmental entity is regarded as a public forum. See, e.g., Fernandes v. Limmer, 663 F.2d 619, 626 (5th Cir. Unit A 1981), reh'g denied, 669 F.2d 729 (1982); Jamison v. City of St. Louis, 828 F.2d 1280, 1283 (8th Cir.1987), cert. denied, 485 U.S. 987, 108 S.Ct. 1289, 99 L.Ed.2d 499 (1988); City of Chicago, 816 F.2d at 339; U.S. Southwest Africa/Namibia Trade & Culture Council v. United States, 708 F.2d 760, 764 (D.C.Cir.1983); Jews for Jesus, Inc. v. Board of Airport Commissioners of the City of Los Angeles, 785 F.2d 791, 793-95 (9th Cir.1986), aff'd on other grounds, 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987); Rosen v. Port of Portland, 641 F.2d 1243, 1245-46 (9th Cir.1981); Kuszynski v. City of Oakland, 479 F.2d 1130, 1131 (9th Cir.1973); Chicago Area Military Project v. City of Chicago, 508 F.2d 921 (7th Cir.), cert. denied, 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975); *923 Wolin v. Port of New York Authority, 392 F.2d 83, 87 (2d Cir.), cert. denied, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968). These courts base their view, in part, on the belief that a large airport facility has the character, pattern of activity, and nature of purpose that makes it an appropriate place for the communications of views, ideas and information. See, e.g., Jamison, 828 F.2d at 1283; Chicago Area Military Project, 508 F.2d at 925. However, the United States Supreme Court, deciding a recent case on overbreadth grounds, bypassed this precise issue. Board of Airport Comm'rs of the City of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569, 573-74, 107 S.Ct. 2568, 2571-2572, 96 L.Ed.2d 500 (1987). In fact, the concurring opinion stated, "... the Court's opinion ... should not be taken as indicating that a majority of the Court considers the Los Angeles International Airport to be a traditional public forum." Id. at 577, 107 S.Ct. at 2573 (Rehnquist, Chief J., and White, J., concurring). This issue is one of first impression in the Eleventh Circuit.
Most courts considering the nature of a municipal airport terminal conclude that it is a public forum without clearly stating whether it holds the terminal to be a "traditional" or "designated" public forum. However, it is not a crucial distinction for the purpose of this Court's analysis because the standards governing the state's ability to restrict expressive activity are the same whether the public forum is a traditional or designated one. See Perry, 460 U.S. at 45-46, 103 S.Ct. at 954-955. Nevertheless, this Court finds that municipal airport terminals are not property that "by long tradition or by government fiat have been devoted to assembly and debate," and thus do not fall within the traditional public forum category. Id. at 45, 103 S.Ct. at 954.
The Court must now determine whether it believes the MIA is a public forum by designation; if not, then the airport terminals at the MIA naturally fall into the third category and are nonpublic forums. Therefore, the Court will consider precedents which have concluded that the particular forum was a public forum by designation and those that have concluded that the particular forum was nonpublic.
In Cornelius, the United States Supreme Court held that a government-sponsored charity drive was not a public forum with respect to all tax-exempt organizations. 473 U.S. at 804, 105 S.Ct. at 3450. In so holding, the Supreme Court stressed the government's prerogatives as an employer and drew an analogy to the discretion exercised by the government's private counterparts when it stated, "The federal workplace, like any place of employment, exists to accomplish the business of the employee. (citation omitted). `[T]he Government as an employer, must have wide discretion and control over the management of its personnel and internal affairs.' (citation omitted). It follows that the Government has the right to exercise control over access to the federal workplace in order to avoid interruptions to the performance of the duties of its employees." Id. at 805-806, 105 S.Ct. at 3451.
Similarly, in Perry, the United States Supreme Court emphasized that while the school allowed various community groups to use the school mail system for communication, it did not open its mail system "for indiscriminate use by the general public." 460 U.S. at 47, 103 S.Ct. at 956. The Supreme Court reasoned that as a matter of labor-management relations, the school district could restrict access to the mail service to the teachers' official bargaining representative. Id. at 51, 103 S.Ct. at 958. The Fifth Circuit, in holding that a public television station was not a public forum, similarly reasoned that the pattern of usual activity for a public television station is not for the general public to schedule programs but is for the general public to watch or not watch programs as desired. Muir v. Alabama Educ. Television Comm'n, 688 F.2d 1033, 1041 (5th Cir. 1982), cert. denied, 460 U.S. 1023, 103 S.Ct. 1274, 75 L.Ed.2d 495 (1983).
And in Lehman, the United States Supreme Court, relying on testimony that during the 26 years of public operation, the Shaker Heights system had not permitted any political or public issue advertising on *924 its vehicles, held that the City did not create a public forum in the "car cards" in its public transportation system where access to the cards had been limited to nonpolitical advertising. 418 U.S. at 304, 94 S.Ct. at 2717. See also Gannett Satellite Inf. Net. v. Metro. Transp. A., 745 F.2d 767, 773 (2nd Cir.1984) (public areas of New York City's MTA stations were held to be public property which was not by tradition or designation a forum for public communication).
In another case, the United States Supreme Court considered the policy of preventing political campaigning on the military base before determining that it was not a public forum. Greer v. Spock, 424 U.S. 828, 836-838, 96 S.Ct. 1211, 1216-1218, 47 L.Ed.2d 505 (1976). See also Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 266-267, 108 S.Ct. 562, 568-569, 98 L.Ed.2d 592 (1988) (Court found school newspaper published by a journalism class to be a nonpublic forum on the basis of the district court's factual findings about the degree to which the class instructor actually controlled the publication).
In these decisions, the Courts emphasized that the medium at issue was not intended to be used by the public to exercise its own rights of expression, but was intended instead to serve a narrower, instrumental purpose of the state agency in question  a purpose, moreover, that was incompatible with unrestricted access with respect to even a particular class of speakers. See Estiverne v. Louisiana State Bar Ass'n, 863 F.2d 371, 381 (5th Cir.1989).
Now focusing on the nature of the MIA, in determining whether the Court finds a municipal airport to be either a designated public forum or nonpublic forum, its initial focus is on whether the county government has dedicated the MIA primarily as a site for communicative activity. See Perry, 460 U.S. at 46, 103 S.Ct. at 955. The Court finds no evidence of any intent by the county government to create a public forum at the MIA. Neither the written policy nor the actual practice of the county or the MIA officials manifests an intent to designate the MIA as a public forum. To the contrary, the government's consistent policy has been to limit participation at the MIA and to require parties seeking admission for First Amendment expression to first obtain permission in accordance with applicable airport regulations. Nor does the history of the MIA support a finding that the government was motivated by an affirmative desire to provide an open forum for First Amendment expression at the airport terminal. The historical background indicates that the MIA was designed to minimize disruption to the workplace by lessening the amount of expressive activity occurring on the property.
Furthermore, an examination of the nature of the property involved strengthens the conclusion that the MIA is a nonpublic forum. See Student Coalition, 776 F.2d 431, 436 (First Amendment rights must be analyzed in light of the special characteristics of the environment) (citations omitted). The Court finds that the primary purpose of traditional transportation facilities such as the MIA, railroad stations/terminals and bus stations/terminals are not communicative; rather, they are intended to serve the narrower, instrumental transportation needs of the public. These facilities were never intended to play host to all of society's baggage.
Therefore, the Court finds that the expressive speech desired by Plaintiffs is incompatible with the intended use of the MIA. Thus, the MIA must fall within the third category of a nonpublic forum because the Court finds that neither the history of the MIA nor its policies indicate any intent by the government or the state to dedicate it primarily as a site for communicative activity. See Perry, 460 U.S. at 46, 103 S.Ct. at 955. Furthermore, the Court will not infer that the MIA intended to create a public forum because the nature of congested municipal airport terminals, especially those at the MIA, are inconsistent with expressive activity. Cornelius, 473 U.S. at 803, 105 S.Ct. at 3449.
Having determined that the MIA is a nonpublic forum, this Court will address the permissible restrictions on expressive activity within the terminals at the MIA. *925 Of the three categories of forums, a nonpublic forum offers the least constitutionally-protected access for First Amendment expression. The United States Supreme Court has sustained the use of subject matter restrictions in "`nonforums' provided that they are reasonably designed to limit expressive activities to uses compatible with the public facilities' intended purposes and not imposed to suppress expression simply because public officials oppose the speaker's particular point of view." U.S. Southwest Africa/Namibia, 708 F.2d at 763; United States Postal Service v. Council of Greenburgh, 453 U.S. 114, 131 n. 7, 101 S.Ct. 2676, 2686 n. 7, 69 L.Ed.2d 517 (1981) (State has the power to preserve the property under its control for the use to which it is lawfully dedicated). Thus, the MIA may restrict access to the forum based on the subject matter of the speech and the identity of the speaker as long as its decision is reasonable and viewpoint neutral. Estiverne, 863 F.2d at 376 (citing Cornelius, 473 U.S. at 806, 105 S.Ct. at 3451). Even a symbolic, rather than direct operations interference will be enough to permit the MIA to ban the expressive activity. Finally, it is important to note that in restricting access to a nonpublic forum, there is no requirement that the restriction be narrowly tailored or that the government's interest be compelling. Cornelius, 473 U.S. at 809, 105 S.Ct. at 3452.
Because this Court finds that the MIA is a nonpublic forum, the public forum requirements which the Plaintiffs urge upon us do not apply. The restrictions made by the officials at the MIA will be upheld as long as they are reasonably designed to limit expressive activities to uses compatible with the public facilities' intended purposes and not imposed to suppress expression simply because public officials oppose the speaker's particular point of view. See Perry, 460 U.S. at 46, 103 S.Ct. at 955. The Court makes the specific finding that the restrictions made by the officials at the MIA are reasonably designed to limit expressive activities to uses compatible with the intended purposes of the MIA and have not been imposed to suppress expression simply because the officials at the MIA oppose the Plaintiffs' particular point of view. Therefore, Plaintiffs' argument that the MIA's policy of "no tables/signs" violates the First Amendment of the Constitution is totally without merit.
However, the Court will nevertheless continue to analyze the alleged violations of the airport regulations, by assuming arguendo that a municipal airport is a public forum, for the benefit of a reviewing Court who might disagree with this Court's finding that a municipal airport is a nonpublic forum.
In a public forum, any regulation of the time, place and manner of speech must be "content-neutral, [] narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication." Perry, 460 U.S. at 45, 103 S.Ct. at 955 (citations omitted); "Carefully tailored restraints designed to further legitimate governmental interests in preserving the forum for the normal pattern of activities conducted there are constitutionally acceptable." Fernandes, 663 F.2d at 633. However, "[a]dditional restrictions such as an absolute prohibition on a particular type of expression will be upheld only if narrowly drawn to accomplish a compelling government interest." Grace, 461 U.S. at 177, 103 S.Ct. at 1707.

A. CONTENT-NEUTRAL
In regard to the distribution of literature or information in the free speech area at the MIA, the facts show that the airport officials have applied the regulation disallowing the use of fixed or semi-permanent fixtures as a means of distributing information in a content-neutral manner. Numerous organizations, including the Girl Scouts of America, the United Way, the Dade County Fire Department and the Heart Fund have requested the use of tables or permanent fixtures to distribute their literature at the MIA. All of those requests were denied (Tr. 74, 93, DE 42; pg. 9, Exhibit 1, DE 21). Plaintiffs, however, attempt to argue waiver by stating that they were permitted to use such tables for a period during 1981. The Court finds *926 this argument unpersuasive because the testimony shows that Plaintiffs were given such permission during a time when both the Director and Deputy Director of the Aviation Department were not in Miami. Robert Diaz, Jr., Chief of Terminal Operations for the Department of Aviation, not being aware of the Department's policy, gave Plaintiffs permission to use the table to distribute information, but withdrew this permission when he became aware of the Department's policy prohibiting the use of such tables (Tr. 89, DE 42). Therefore, the Court finds that the policy does not regulate the activities of some groups over others based on the content of the speech. Perry, 460 U.S. at 45, 103 S.Ct. at 955 (citations omitted).
Plaintiffs also attempt to argue that the MIA's "no table" policy is not content neutral because flower vendors' flower carts, or other types of carts or stands complete with signs, all semi-permanent fixtures, are permitted in the First Amendment zone and, thus, the regulation favors commercial groups over noncommercial groups. The Court similarly finds this argument without merit. The sale of flowers does not constitute the distribution of information and the use of flower carts is not expressive speech worthy of First Amendment protection. Finally, the MIA has "absolute control over [the flower carts] and can relocate them and require their removal at any time." (Tr. 53, DE 42).
Regarding Plaintiffs' desire to attach posterboard size and type signs to card tables, Defendants argue that not all signs are prohibited; rather, large fixed signs that are propped up against support columns or affixed to tables are restricted because of the inherent problems aforementioned (Tr. 44, De 42). For example, small signs held by a tour operator are permissible because they are small and the tour operator would not be in that location longer than necessary for the disembarking airline passengers to locate him. Id. Plaintiffs argue that "signs draped from a table should be no more disruptive than an identification tour sign exhibited to a tour group of arriving passengers." (pg. 8, DE 34). The Court rejects this type of "marginal harm" argument. Neither party has presented any evidence to suggest that the regulation was applied inconsistently to one type of speech over another based on the viewpoint expressed or the content of the speech itself.

B. NARROWLY TAILORED
[I]n assessing the reasonableness of a regulation, the Court must weigh heavily the fact that communication is involved; the regulation must be narrowly tailored to further the State's legitimate interest. Grayned v. City of Rockford, 408 U.S. 104, 116-17, 92 S.Ct. 2294, 2303-04, 33 L.Ed.2d 222 (1972). The Court will consider individually the Defendants' arguments against permitting the proposed tables and signs.

1. Traffic Flow Problems

It should be noted at the outset that the argument of restricting First Amendment rights in an airport based on overcrowdedness does not defeat the conclusion that airport terminals are public forums; rather, such factors go to the reasonableness of the time, place, and manner restrictions imposed. Fernandes, 663 F.2d at 626. One author commenting on this problem stated:
A public forum should be relatively spacious to ensure both the physical and psychological comfort and convenience of all users of the property. The assurance of physical convenience is a practical concern: keeping passageways open so that traffic may flow unobstructed.
Note, Public Forum Analysis After Perry Education Association v. Perry Local Educators' Association  A Conceptual Approach to Claims of First Amendment Access to Publicly Owned Property, 54 Fordham L.Rev. 545, 555 (1986) (footnote citations omitted). See also Rochford, 585 F.2d at 268 (goal of maintaining a free and orderly flow of traffic in airport is valid concern); City of Chicago, 816 F.2d at 339-40 ("`[A] state's interest in protecting the "safety and convenience" of persons using a public forum is a valid governmental objective.'") (citing Heffron v. Interna- *927 tional Society for Krishna Consciousness, 452 U.S. 640, 650, 101 S.Ct. 2559, 2565, 69 L.Ed.2d 298 (1981); Id. at 340 ("the City has valid concerns about expediting the processing of travelers, maintaining the free and orderly flow of traffic, and avoiding the disruption of normal airport activities.") (citing Rochford, 585 F.2d at 268-69); Supersign of Boca Raton, Inc. v. City of Fort Lauderdale, 766 F.2d 1528, 1530-1531 (11th Cir.1985) (traffic regulation is substantial governmental interest) (citations omitted).
To understand the potential restrictions on traffic flow, the Court has considered the specific passenger demands in the terminal thoroughfare as well as in the First Amendment areas. The MIA was designed and built well over 20 years ago and the traffic has increased from around ten million annual passengers to nearly twenty million passengers in 1986 (Tr. 57, 70, DE 42). Several witnesses testified that the airport design is no longer adequate for the traffic loads. Id. The First Amendment area in general runs the length of the terminal on both levels in designated areas, inside and outside of the terminal (see Exhibit A). The specific area in question parallels, approximately thirty feet therefrom, the ticket counters inside the terminal. Plaintiffs describe the area as a long, slender double horseshoe-shaped terminal (Tr. 5, DE 42). This area is approximately four to six feet wide within the walking area of the terminal (Tr. 41, 57). The Court notes that Plaintiffs have stated that they "have not challenged the physical designation of First Amendment area" at the MIA (Tr. 5, DE 42). Several witnesses testified that these areas are full during peak periods (Tr. 7, DE 42), and placing tables or other semi-fixed facilities in these areas would cause severe traffic flow problems (Tr. 71, DE 42; pg. 8, Exhibit 1 and pg. 4, Exhibit 2, DE 21). Mr. Gunther stated:
It's not uncommon on any day during the period 12:00 to 1:30 and particularly on weekends or holiday periods for the flow through the First Amendment areas to be completely blocked by passengers or cued at the ticket counters.... To put in any kind of permanent or even a barrier that requires several minutes to move would be an unacceptable impediment to passenger flow through the area.... To inject any other permanent obstacles in there that are not there for reason of passenger comfort, passenger necessity is not an acceptable situation.
(Tr. 71, DE 42). Defendant, Richard H. Judy, Aviation Director for the Dade County Aviation Department, stated, "If [Plaintiffs] put tables [t]here, the ticket counters and passageways would not function. It would just break down the whole terminal." (pg. 11, Exhibit 1, DE 21). Mr. Spofford testified that "There have been times when we had for heavy traffic to remove seating areas completely to allow the booths to back up even further because this space is for today's traffic level is too narrow." (Tr. 43, DE 42). Mr. Spofford also stated that the traffic he is concerned about impeding is not caused by those persons who stop by the First Amendment zone on their own volition but rather those passing through the zone who are not parties to conversations and do not wish to be (Tr. 59, DE 42).
Plaintiffs attempt to rebut Defendants' traffic concern in a variety of ways. First, Plaintiffs argue that the increased problem of their proposed table would be marginal in light of the other fixed objects currently in the First Amendment zones similarly obstructing traffic (Tr. 32-33, DE 42). Examples of these fixed objects include trash cans, change machines, post boxes, advertisements that "jet[] out from the[] pillars that are circular in nature," flower cart, etc. (Tr. 39, DE 42). Mr. Spofford responds by stating that the change machines are fastened to a fixed post and are not in the flow pattern; the mailboxes are for the public and do not face into the walkway; the circular advertising signs are in no way placed to impede the flow of traffic (Tr. 45-47, DE 42); and none of the flower carts intrude into the movement areas (Tr. 52-53, DE 42).
Plaintiffs next state that the card tables are less of a traffic concern because they are portable and could thus be moved during peak traffic hours or during other *928 emergency situations (Tr. 33, DE 42). Plaintiffs even went as far as offering to install wheels on the bottom of the card tables to increase their mobility (Tr. 105, DE 42). Mr. Gunther responded to this propostion by stating:
Well, if you would take time to visit the terminal area on a Saturday afternoon or for that matter any busy afternoon between the hours of 1:00 and 3:00, you will find out that the entire  in many cases, many portions of the terminal, the entire First Amendment area is loaded with baggage, has passengers cued and standing in the area and that once this condition occurs that despite the fact that a card table or table could be physically moved, that the pathway isn't available to allow it to move. To try to move it at that point would probably create a greater hazard than living with it at that point.
Our contention is that by not having it there in the first place, then we don't have to deal with that hazard.
(Tr. 75, DE 42). Plaintiffs also state that the "card table is still back against the[] pillars that are spaced throughout th[e] horseshoe and is certainly out of the way of the main flow of traffic." (Tr. 39, DE 42). Nevertheless, the Court agrees with the following argument made by Defendants:
When a passenger who is la[]den with luggage or a porter trying to wheel somebody's bag at a crowded hour, he doesn't have the option of saying `Would you move that card table over so I can get through.' The card table is there. It's up to you to find your way around the card table. It becomes a fixed structure. It's far different than a person standing there holding a flower.
(Tr. 130, DE 42). Plaintiffs unpersuasively attempt to rebut this by saying "[a] pedestrian can just as well walk around the table as he can walk around a flower cart, advertising kiosk or baggage placed in the middle of walkways." (pg. 5, DE 34).
Third, Plaintiffs argue that Defendants should better allocate the available First Amendment space at the MIA to those wishing to exercise their First Amendment rights. For example, Plaintiffs argue that they should not be deprived of their card table when the MIA could alternatively prevent certain members of the International Center of Krishna Consciousness, where there are "anywhere from eight to ten Krishnas who use the terminal," (Tr. 37, DE 42), from using the designated area (Tr. 36, DE 42). The Court finds these issues to be more appropriately handled by the appropriate MIA officials who draft the regulations and thus, does not need to consider them for the purpose of this Final Order.
The Court further rejects Plaintiffs' argument that Defendants should not be permitted to impose a total ban on the use of card tables because less restrictive alternatives are available, i.e., adopt rules governing the quantity, timing, and use of said tables, limit the number of groups using said tables, regulate the size of said tables, etc. (pg. 7, DE 34). Other courts have recognized such a total ban because of traffic reasons. See, e.g., City of Chicago, 816 F.2d at 339; Rochford, 585 F.2d at 270; Wolin, 392 F.2d at 92 n. 13 ("The potential of card tables for obstruction of traffic is sufficiently great that it may be reasonable to bar their use from the Terminal even at times when other techniques of communication are permissible. We leave that decision in the first instance to the appropriate officials who draw the regulations."); see also Gannett Satellite Information Network Inc. v. Berger, 716 F.Supp. 140 (D.N. J.1989) (total ban on newsracks in municipal airport upheld as a constitutional time, place and manner regulation in a public forum); American Future Systems, Inc. v. Pennsylvania State University, 752 F.2d 854, 865-66 (3d Cir.1984) (In determining whether to uphold a state university's total ban on group demonstrations in the dormitory rooms, the Court stated that it may uphold the regulation only if it is not excessive in light of the state's objective and its function must be limited to determining whether the school has chosen an acceptable  not the least restrictive  alternative.), cert. denied, 473 U.S. 911, 105 S.Ct. 3537, 87 L.Ed.2d 660 (7th Cir.1980) *929 (Court rejected plaintiff's argument that defendants could serve their interest of keeping the streets open and safe for travel through a less restrictive regulation rather than totally prohibiting intersection solicitation because the legislatively expressed concern outweighed plaintiffs' interest).

2. Security Problems

Defendants have also justified the regulation prohibiting the use of tables for security reasons. It is undisputed that airport authorities have legitimate interests in "security and operational efficiency." Jamison, 828 F.2d at 1285; see also City of Chicago, 816 F.2d at 339, 40 ("`[A] state's interest in protecting the "safety and convenience" of persons using a public forum is a valid governmental objective.'") (citing Heffron, 452 U.S. at 650, 101 S.Ct. at 2565); Rochford, 585 F.2d at 271 ("Public safety and welfare as well as efficient operation of the airport are clearly important interests").
Major Donald Matthews, Commander of the Airport District for the Metropolitan Dade Police Department, testified that the officials "must be able to have [their] officers move from a certain point within the terminal to other points at the screening point and be there within five minutes on an emergency basis. There are peak periods at the airport when the passenger traffic gets so great that the officers have to take other routes to get there because of the corridors backed up." (Tr. 83, DE 42). Major Matthews concluded that the use of fixed items such as booths or card tables, large thick signs and heavily traveled passenger areas close to the gates would have an adverse effect on the police's ability to respond to emergency situations (Tr. 83, DE 42). Mr. Gunther also testified that "baggage, packages and other items may be left in inconspicuous areas, under the table, behind the signs (attached to the card table) and could reasonably present a security problem." (Tr. 68, DE 42). The Court finds these actual and perceived security problems reasonable.

3. Aesthetic Problems

Defendants also argue that the use of tables and signs could affect the aesthetic composition of the terminal by "cluttering" the main thoroughfares (Tr. 68, DE 42; pg. 4, Exhibit 2, DE 21). It is a generally accepted principle that aesthetic interests are given protection. A leading United States Supreme Court case recognized that the appearance of a city is a substantial government goal in determining whether to allow the total prohibition of advertising billboards. Metromedia, Inc. v. City of San Diego, 453 U.S. at 507-08, 510, 510 n. 15, 101 S.Ct. at 2892-93, 2893, 2894 n. 15; see also Taxpayers for Vincent, 466 U.S. at 806, 104 S.Ct. at 2129 ("... municipalities have a weighty, essentially aesthetic interest in proscribing intrusive and unpleasant formats for expression."); Supersign of Boca Raton, 766 F.2d at 1530-31 (11th Cir.1985) ("The objectives served by the ordinance, traffic regulation and aesthetic improvement, undoubtedly qualify as substantial governmental interests.") (citations omitted); Berman v. Parker, 348 U.S. 26, 32-33, 75 S.Ct. 98, 102-103, 99 L.Ed. 27 (1954) (state may legitimately exercise its police powers to advance aesthetic values); This Court thus rejects Plaintiffs' argument that this interest is "so abstract and subjective that [it] should not be a[] major consideration by this Court" (pg. 6, DE 34), and that a few tables and signs will not contribute significantly to the aesthetic harm at MIA, on the ground that the Eleventh Circuit has stated, "By prohibiting the operation of some advertisement vehicles, the City solves some of its traffic problem and reduces the total number of unsightly advertisements." Supersign of Boca Raton, 766 F.2d at 1531. "The city may `directly advance' its interests by pursuing a partial solution to its problems, a proposition confirmed by the Supreme Court in Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981)." Id.

4. Conclusion

The Court, having carefully considered the testimony presented and case law aforementioned, finds that because of the *930 incidental resulting restriction on expression, the MIA's regulations prohibiting the use of portable card tables and semi-fixed signs are reasonable, are based on the nature of airport traffic, and are narrowly tailored to serve the MIA's significant interest in airport safety, efficiency and aesthetics. Furthermore, the airport's regulation does not restrict the use of signs as a means of expressive speech but rather merely limits the size of the signs so as not to create increased safety perils and impede the flow of traffic within the MIA. See City of Chicago, 816 F.2d at 340; Taxpayers for Vincent, 466 U.S. at 816-17, 104 S.Ct. at 2134-2135; Heffron, 452 U.S. at 647, 101 S.Ct. at 2563; Carey v. Brown, 447 U.S. 455, 470-471, 100 S.Ct. 2286, 2295-2296, 65 L.Ed.2d 263 (1980); Grayned, 408 U.S. 104, 115-117, 92 S.Ct. 2294, 33 L.Ed.2d 222; Police Department of Chicago v. Mosley, 408 U.S. 92, 98, 92 S.Ct. 2286, 2291, 33 L.Ed.2d 212 (1972).

C. ALTERNATIVE CHANNELS OF COMMUNICATION
Finally, the Court must determine whether ample alternative methods of communication are available to Plaintiffs. Perry, 460 U.S. at 45, 103 S.Ct. at 954. The right to employ every conceivable method of communication at all times and in all places is not a right guaranteed by the First Amendment. Taxpayers for Vincent, 466 U.S. at 812, 104 S.Ct. at 2132. However, restrictions on expressive activity may be invalid if the remaining modes of communication are inadequate. Id. In the case sub judice, Plaintiffs claim that their ability to distribute literature is severely curtailed by the airport's "no table/sign" policy. This Court finds the facts in the case sub judice analogous to the facts in the case of City of Chicago, where plaintiffs were defending a similar position in which the Court found that the only restrictions were on the physical props that [Plaintiffs] utilized in order to help spread their message. City of Chicago, 816 F.2d at 340. The United States Supreme Court, commenting on this issue, stated:
The Los Angeles ordinance does not affect any individual's freedom to exercise the right to speak and to distribute literature in the same place where the posting of signs on public property is prohibited. (footnote citation omitted). To the extent that the posting of signs on public property has advantages over these forms of expression (citation omitted), there is no reason to believe that these same advantages cannot be obtained through other means. To the contrary, the findings of the District Court indicate that there are ample alternative modes of communication in Los Angeles.

Taxpayers for Vincent, 466 U.S. at 812, 104 S.Ct. at 2132 (emphasis supplied).
Similarly, the Court finds in this case that Plaintiffs are not prohibited from displaying their literature or otherwise prohibited from distributing literature or discussing their positions with people passing by (Tr. 6, DE 42). The record reflects that Plaintiffs have never been denied a request to exercise First Amendment rights by placing messages on a sign to be carried, as opposed to one to be affixed to a card table (Tr. 45, DE 42). And Plaintiffs have not shown that they have been denied the right to speak to members of the public or otherwise express their views at the MIA. The facts in this case allegedly being violative of the First Amendment are a far cry from those situations ruled unconstitutional by other courts. See, e.g., Jews for Jesus, Inc., 482 U.S. at 573-76, 107 S.Ct. at 2571-72 (Los Angeles International Airport's policy of banning all First Amendment activity in portions of the terminal was held unconstitutionally overbroad, regardless of whether the forum was public or nonpublic); Fernandes, 663 F.2d at 633-34 (Dallas-Fort Worth airport's blanket prohibition of solicitation and distribution inside its terminals held overbroad because it unduly restricted First Amendment activity within a public forum).

II. VAGUENESS AND OVERBREADTH CHALLENGES
Plaintiffs argue that the rules and regulations governing protected First Amendment *931 activities at the MIA, specifically Chapter 25 of the Dade County Code, Sections 25-2.2(a), 25-2.2(c), 25-2.2(d), 25-2.2(f), 25-2.2(h), 25-2.7, 25-2.8, and 25-2.9 are unconstitutional on their face and as construed and applied to the distribution of Plaintiffs' literature and solicitation of funds in that they abridge the free exercise of speech and press, are overbroad, vague and contrary to the United States Constitution.
"[T]he Supreme Court has suggested that in cases involving a facial challenge to the overbreadth and vagueness of a statute, a court should first consider whether the statute is overbroad, and, assuming it is not, then whether it is unconstitutionally vague." CISPES (Committee in Solidarity With the People of El Salvador) v. Federal Bureau of Investigation, 770 F.2d 468, 472 (5th Cir.1985) (citing Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362, [reh'g denied, 456 U.S. 950, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1981)]).

A. OVERBREADTH CHALLENGE
Under the First Amendment overbreadth doctrine, an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face because it also threatens others not before the court  those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid. Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 503, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1985). "Thus, the concern with an overbroad statute stems not so much from its application to completed conduct, but rather from the possibility that the threat of its application may deter others from engaging in otherwise protected expression." CISPES, 770 F.2d at 472 (citing Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). A statute may be invalidated on its face, however, only if the overbreadth is substantial as well, judged in relation to the statute's plainly legitimate sweep. Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973). "... [T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." Taxpayers for Vincent, 466 U.S. at 801, 104 S.Ct. at 2126. "Thus, a statute should not be invalidated for overbreadth unless it reaches a substantial number of permissible activities." CISPES, 770 F.2d at 473 (citing New York v. Ferber, 458 U.S. 747, 771, 102 S.Ct. 3348, 3362, 73 L.Ed.2d 1113 (1982)). Plaintiffs argue that Sections 25-2.2(d), 25-2.7 and 25-2.9 are unconstitutionally overbroad. "To withstand an overbreadth challenge based on first amendment rights, an ordinance must be narrowly drawn to serve compelling needs of society." U.S. Labor Party v. Pomerleau, 557 F.2d 410, 412 (4th Cir.1977) (citing Broadrick, 413 U.S. at 611-615, 93 S.Ct. at 2915-2918). With these principles in mind, the Court will consider the challenged regulations.
In Coates v. Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), the United States Supreme Court struck down a city ordinance which prohibited three or more persons from assembling on public sidewalks and conducting themselves in such a way as to annoy any police officer or other persons who should happen to pass by. Coates, 402 U.S. at 614, 91 S.Ct. at 1688. The Court stated that the ordinance was unconstitutionally broad because it authorized the punishment of constitutionally protected conduct. Id. The Court stated that the city was free to enact and enforce ordinances directed with reasonable specificity toward the conduct to be prohibited; however, "[i]t cannot constitutionally do so through the enactment and enforcement of an ordinance whose violation may entirely depend upon whether or not a policeman is annoyed." Coates, 402 U.S. at 614-615, 91 S.Ct. at 1688. (footnote citation omitted). See also Jews for Jesus, Inc., 482 U.S. at 573-576, 107 S.Ct. at 2571-2573 (resolution banning all "First Amendment activities" within the "Central Terminal Area" at Los Angeles International Airport held facially unconstitutional under *932 the First Amendment overbreadth doctrine regardless of whether the forum was public or nonpublic because the resolution prohibited all protected expression and did not merely regulate expressive activity that might create problems such as congestion or the disruption of airport users' activities); Fernandes, 663 F.2d at 633-634 (Dallas-Fort Worth airport's blanket prohibition of solicitation and distribution inside its terminals held overbroad because it unduly restricted First Amendment activity within a public forum); Pomerleau, 557 F.2d at 412 (ordinance which prohibited the amplification of political speech exceeding a specified number of decibels, as measured within a few feet of the speaker, held vague and overbroad because a violation depends on the subjective opinion of the investigator and thus the speaker has no protection against arbitrary enforcement of the ordinance) (citations omitted).
However, in Grayned, the United States Supreme Court upheld an anti-noise ordinance which prohibited any person, while on public or private grounds adjacent to any building in which a school or any class thereof is in session, from willfully making or assisting in the making of any noise or diversion which disturbs or tends to disturb the peace or good order of such school session or class thereof. Grayned, 408 U.S. at 107-08, 92 S.Ct. at 2298-99. The Court stated that this ordinance "contained no broad invitation to subjective or discriminatory enforcement. The city did not claim the broad power to punish all `noises' and `diversions.'" Id. at 113, 92 S.Ct. at 2301.
Based on current United States Supreme Court precedents, the Court finds that Sections 25-2.2(d), 25-2.7 and 25-2.9 are not constitutionally overbroad. Plaintiffs have not shown any set of facts that would suggest that others are being deterred from engaging in the activity which Plaintiffs seek to have declared constitutionally protected. Therefore, the Court will now consider Plaintiffs' constitutional vagueness arguments.

B. VAGUENESS CHALLENGE
"When a statute or regulation is challenged under the due process doctrine of vagueness, a court must look at the enactment from two angles: (1) whether it provides sufficient notice of what may not be done, and (2) whether it contains reasonably clear guidelines so as to prevent official arbitrariness or discrimination in its enforcement." Rochford, 585 F.2d at 267 (citations omitted). First, "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (citations omitted); see also Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926) (any law is unconstitutionally vague if people "of common intelligence must necessarily guess at its meaning and differ as to its application."). "[T]he complainant must demonstrate that the law is impermissibly vague in all of its applications." Hoffman Estates, 455 U.S. at 497, 102 S.Ct. at 1193. Second, a vague law lacks explicit standards for its applications and, thus, "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." Grayned, 408 U.S. at 108-09, 92 S.Ct. at 2299 (footnote citation omitted); CISPES, 770 F.2d at 475. "While the doctrine is concerned with both notice and enforcement, the Court has recognized that fear of arbitrary enforcement is the more important consideration." CISPES, 770 F.2d at 475 (citing Kolender, 461 U.S. at 358, 103 S.Ct. at 1858). With these principles in mind, the Court will consider the challenged regulations.

1. Sufficient Notice

"[A] standardless ordinance is subject to facial attack under the due process clause through the vagueness doctrine." Brockert v. Skornicka, 711 F.2d 1376, 1381 (7th Cir.1983). Plaintiffs allege that Sections *933 25-2.2(c) and 25-2.2(d), and 25-2.7(a) are unconstitutionally vague. Section 25-2.2(c) provides, in part:
Persons having given such written notice shall be permitted to conduct their activities in or upon the public airport areas, ..., subject only to such restrictions as may be prescribed from time to time by the director, provided, however, that any such restrictions shall be reasonable and appropriate and shall be prescribed only after a finding by the director that the restrictions are necessary to avoid injury, or the likelihood of injury, to persons or property, or to assure the safe and orderly use of the airport facilities by the public, and such restrictions shall be applied equally and without discrimination as to all persons who have given such written notice.
Section 25-2.2(d) provides, in part:
No person, while engaging in the activities provided for herein, shall prevent or interfere with access to or egress from any airport, airline, concession or washroom facilities or premises, including passenger concourses, escalators and elevators, nor shall such person in any manner assail, coerce, threaten or physically disturb any member of the public, county, airline or concession employee or any other person for any reason, nor shall such activity prevent, impede, interfere with, hamper or curtail the conduct of business at the airport....
Section 25-2.7(a) provides:
No person(s) singly or in association with others shall by his or their conduct or by congregating with others prevent any other person or persons lawfully entitled thereto from the use and enjoyment of the airport and its facilities or any part thereof, or prevent any other person or persons lawfully entitled thereto from passage from place to place, or through entrances, exits or passageways on the airport.
Plaintiffs argue that the terms used in these sections, i.e., "reasonable," "appropriate," "injury or the likelihood of injury to persons or property," and language such as: "nor shall such person in any manner assail, coerce, threaten or physically disturb any member of the public, ..., nor shall such activity prevent, impede, interfere with, hamper or curtail the conduct of business at the airport," do not sufficiently identify what conduct is prohibited, and that the sections permit undue discretion on the part of the MIA officials enforcing these provisions.
Several cases provide guidance in our examination of Plaintiffs' challenges. In International Society for Krishna Consciousness of Atlanta v. Eaves, the Court struck down as unconstitutionally vague the portion of the ordinance stating that "no person shall ... hamper or impede the conduct of any authorized business at the airport" because several constructions are plausible and people cannot know what to expect. 601 F.2d 809, 832 (5th Cir.1979). Similarly, in Thornhill v. Alabama, the United States Supreme Court invalidated an Alabama statute which prohibited picketing "for the purpose of hindering, delaying, or interfering with or injuring any lawful business" because that offense "can be proved merely by showing that others reacted in a way normally expected of some upon learning the facts of a dispute." 310 U.S. 88, 100, 60 S.Ct. 736, 743, 84 L.Ed. 1093 (1940). And in Rochford, the Court found, among other violations, that Section 3(C), which provided "that `[n]o person shall interfere with the free passage to, or access of, other persons to corridors, entrances, doorways, or offices of airport facilities'" was not drafted in a manner sufficiently precise to avoid the possibility of improper application by the enforcing officials. 585 F.2d at 270. Therefore, this Court finds that the portion of Section 25-2.2(d), "nor shall such activity prevent, impede, interfere with, hamper or curtail the conduct of business at the airport," is unconstitutionally vague under the due process clause and, therefore, must be stricken from the Dade County Code.
In Coates, the Court struck down as unconstitutionally vague a city ordinance that prohibited three or more persons from assembling on public sidewalks and conducting themselves in such a way as to *934 annoy any police officer or other persons who should happen to pass by because it "subjects the exercise of the right of assembly to an unascertainable standard." Coates, 402 U.S. at 614, 91 S.Ct. at 1688. The Court stated:
Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. As a result, "men of common intelligence must necessarily guess at its meaning."
Id. (citation omitted). See also Rochford, 585 F.2d at 268-70 ("persons authorized by law" is unconstitutionally vague because the regulation does not explain who is "authorized by law," and subsection prohibiting "disturbances" is too imprecise and is therefore impermissible); Keyishian v. Board of Regents of the University of the State of New York, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (statutes requiring or authorizing the removal of faculty members for seditious utterances are unconstitutionally vague); Pomerleau, 557 F.2d at 412 (ordinance which prohibited the amplification of political speech exceeding a specified number of decibels, as measured within a few feet of the speaker, held vague and overbroad "[b]ecause a violation depends on the subjective opinion of the investigator" and thus "the speaker has no protection against arbitrary enforcement of the ordinance") (citations omitted).
Therefore, this Court finds that Section 25-2.7(a), because of the language "persons lawfully entitled thereto," is unconstitutionally vague under the due process clause and, therefore, must be stricken from the Dade County Code.
In Cameron, appellants argued that the statute forbidding "picketing ... in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any ... county ... courthouses...." was so vague that men of common intelligence must necessarily guess at its meaning. Cameron v. Johnson, 390 U.S. 611, 616, 88 S.Ct. 1335, 1338, 20 L.Ed.2d 182 reh'g denied, 391 U.S. 971, 88 S.Ct. 2029, 20 L.Ed.2d 887 (1968). However, the Court stated:
The terms `obstruct' and `unreasonably interfere' plainly require no `guess[ing] at [their] meaning.' ... We conclude that the statute clearly and precisely delineates its reach in words of common understanding. (footnote citation omitted). It is `a precise and narrowly drawn regulatory statute evincing a legislative judgment that certain specific conduct be ... proscribed.'
Id. (citing Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963)).
Furthermore, in Eaves, an ordinance which provided that "no person shall ... [i]n anywise obstruct, delay, or interfere with the free movements of any other person, seek to coerce or physically disturb any other person, or hamper or impede the conduct of any authorized business at the Airport," was challenged on vagueness and overbreadth grounds. 601 F.2d at 830. "Appellants focus on the terms `obstruct,' `delay,' `interfere,' `coerce,' `disturb,' `hamper,' and `impede.'" Id. The Court found that the phrase "seek to coerce or physically disturb any other person" posed little problem because "coerce" is used throughout the law and one does not coerce unless one threatens some serious harm or applies force; the phrase "physically disturb" is sufficiently precise because it obviously involves some harmful or offensive contact, actual or apparently imminent, and not acts that are accidental or careless; the phrase "in anywise obstruct, delay or interfere with the free movement of any other person" was not unconstitutional on its face, relying on Cameron, 390 U.S. at 616, 88 S.Ct. at 1338. Eaves, at 831-32. Appellants, like the Plaintiffs in the case sub judice, argued that "terms like `reasonable,' `equitable,' `efficient and effective operation,' and `fair and as equal as possible' were too vague and gave the Commissioner essentially unlimited discretion to circumscribe their activities." Eaves, 601 F.2d at 825. Nevertheless, the Court could "not see how appellants [were] injured by this alleged vagueness." Id.
*935 The United States Supreme Court also found no merit to an unconstitutional vagueness attack upon an anti-noise ordinance which prohibited persons from willfully making noise or diversion which disturbs the peace or good order of school sessions. Grayned, 408 U.S. at 110-114, 92 S.Ct. at 2299-2304. The Court stated:
The words of the Rockford ordinance are marked by "flexibility and reasonable breadth, rather than meticulous specificity," (citation omitted), but we think it is clear what the ordinance as a whole prohibits. Designed, according to its preamble, "for the protection of Schools," the ordinance forbids deliberately noisy or diversionary (footnote omitted) activity that disrupts or is about to disrupt normal school activities.... Were we left with just the words of the ordinance, we might be troubled by the imprecision of the phrase "tends to disturb." (footnote citations omitted). However, ..., the Supreme Court of Illinois construed a Chicago ordinance prohibiting, inter alia, a "diversion tending to disturb the peace," and held that it permitted conviction only where there was "imminent threat of violence." (Emphasis supplied.) (citation omitted). Since Meyer was specifically cited in the opinion below, and it in turn drew heavily on Gregory, we think it proper to conclude that the Supreme Court of Illinois would interpret the Rockford ordinance to prohibit only actual or imminent interference with the "peace or good order" of the school. (footnote omitted).
... We do not have here a vague, general "breach of the peace" ordinance, but a statute written specifically for the school context, where the prohibited disturbances are easily measured by their impact on the normal activities of the school. Given this "particular context," the ordinance gives "fair notice to those to whom [it] is directed." (footnote citation omitted). Although the Rockford ordinance may not be as precise as the statute we upheld in Cameron v. Johnson, 390 U.S. 611, 20 L.Ed.2d 182, 88 S.Ct. 1335 (1968)  which prohibited picketing" in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from" any courthouse we think that, as in Cameron, the ordinance here clearly "delineates its reach in words of common understanding." Id., at 616 [88 S.Ct. at 1338].
... The vagueness of these terms, by themselves, is dispelled by the ordinance's requirements that (1) the "noise or diversion" be actually incompatible with normal school activity; (2) there be a demonstrated causality between the disruption that occurs and the "noise or diversion"; and the acts be "willfully" done. "Undesirables" or their "annoying" conduct may not be punished.
Id. at 110-114, 92 S.Ct. at 2300-2302.
Many other Courts have rejected vagueness arguments similar to those made in the present case. See, e.g., Rochford, 585 F.2d at 269-70 (where court held that prohibition against "noise" which interferes with the ability of others to hear announcements or transact business was not "vague"). Id. at 270 (airport officials ability to declare emergency because of unusually congested conditions or the necessity of taking emergency security measures held sufficiently narrow and definite to be a permissible limitation of First Amendment activities); Watts v. United States, 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) (where the Court found a statute making it a crime to threaten the life of the President constitutional on its face but also recognized the important distinction between "threats" and protected speech); CISPES, 770 F.2d at 476 (the term "harass" is sufficiently precise to avoid facial invalidation); United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966) (18 U.S.C. Section 241, which makes criminal a conspiracy by two or more persons "to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment" of any of his constitutional rights, survived vagueness challenge); United States v. Lampley, 573 F.2d 783 (3d Cir.1978) (47 U.S.C. Section 223, which provides that "it is a crime to make an interstate telephone call without disclosing [one's] identity and with intent to annoy, abuse, threaten, or harass" *936 was narrow enough to withstand a vagueness challenge).
Accordingly, the Court finds, with the exception of the portion of Section 25-2.2(d) and Section 25-2.7(a) aforementioned, that the challenged provisions are not void for vagueness because the ordinance defines the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited, and in a manner that does not encourage arbitrary and discriminatory enforcement. Kolender, 461 U.S. at 357, 103 S.Ct. at 1858. "It is not necessary for the lawmaker ... to define words in common usage if the statute uses them according to their everyday meaning not as terms of art." CISPES, 770 F.2d at 477 (citing Kramer v. Price, 712 F.2d 174, 179 (5th Cir.1983) (Rubin, J., dissenting), reh'g granted, 716 F.2d 284 (5th Cir.1983), aff'd on other grounds on reh'g, 723 F.2d 1164 (5th Cir. 1984) (en banc)); United Beverage Company of South Bend, Inc. v. Indiana Alcoholic Beverage Commission, 566 F.Supp. 650, 662 (N.D.Ind.1983) ("The due process prohibition against excessive vagueness will not invalidate every statute which a court of review believes could have been more precisely drafted."), aff'd, 760 F.2d 155 (7th Cir.1985); CISPES, 770 F.2d at 476-477 n. 8 ("Of course the mere existence of these terms in the cited statutes is not determinative of their constitutionality. But their common usage, and the application of these [cited] statutes in numerous cases, is evidence that the terms have a generally accepted meaning, and are not constitutionally suspect."). "Thus, while we do not doubt that `the imagination can conjure hypothetical cases in which the meaning of these terms will be [a] nice question (citation omitted), we do not believe they facially offend the concepts of notice and specificity with which the vagueness doctrine is concerned." CISPES, 770 F.2d at 477.

2. Standardless Discretion

Plaintiffs argue that many sections of Chapter 25 of the Dade County Code are not narrowly tailored because they vest too much discretion in the enforcing officials. In relying upon Rochford, 585 F.2d at 267, Plaintiffs contend that the ordinance must "contain[] reasonably clear guidelines so as to prevent official arbitrariness or discrimination in its enforcement." Defendants distinguish the cases cited by Plaintiffs by arguing as follows:
Unlike a clerk issuing an occupational permit, or a sheriff issuing a parade permit, the Director of a major international airport, such as Miami International Airport, is a high level executive whose duties are by their nature discretionary.... It would be absurd to suggest that the Board of County Commissioners consisting of nine private citizens who serve essentially without salary and meet once very two weeks should be giving the Aviation Director specific directions as to where and when persons should be allowed to exercise First Amendment Rights at Miami International Airport. (pg. 11, DE 36).
In Cox v. Louisiana, 379 U.S. 559, 569, 85 S.Ct. 476, 483, 13 L.Ed.2d 487 (1965) administrative discretion was exercised in construing the term "near" where a defendant was arrested for picketing near a courthouse. There, the Supreme Court stated that this "type of narrow discretion which this Court has recognized as the proper role of responsible officials in making determinations concerning the time, place, duration, and manner of demonstrations."
The Court reasoned:
It is not the type of unbridled discretion which would allow an official to pick and choose among expressions of view the ones he will permit to use the streets and other public facilities, which we have invalidated in the obstruction of public passages statutes ... Nor does this limited administrative regulation of traffic which the Court has consistently recognized as necessary and permissible, constitute a waiver of law which is beyond the power of the police.
Id. at 569, 85 S.Ct. at 483.

3. Sections 25-2.2(a) and 2.2(b)

Plaintiffs state that Section 25-2.2(a), Solicitation of contributions and dis- *937 tribution of materials, which requires an applicant to "fully inform" the director of the proposed activity, is completely devoid of standards on what information fully informs the director, thus relying solely on the director's judgment in determining what information is sufficient. Plaintiffs argue that "[w]hile the content of the notice is set forth in Section 25-2.2(b), the statute puts the final determination in the hands of the director as to what `fully informed' means, allows the director to ask for more information if the `purpose' set forth in the notice is not to his standards, and to delay the permission to conduct this activity if he feels that the information is insufficient." (pg. 8, DE 19). Plaintiffs also state that much of the information requested is completely irrelevant to the director's determination (Id.). The Court finds this argument wholly without merit as Section 25-2.2(b) clearly explains what is required in the written notice mentioned in Section 25-2.2(a).

4. Sections 25-2.2(c) and 2.2(g)

Plaintiffs argue that the criteria of Section 25-2.2(c) requires the licensing authority to appraise facts, exercise judgment and form an opinion as to what causes the "likelihood of injury" or what amounts to the "safe and orderly use of an airport" without any objective language to guide the director's judgment. Plaintiffs argue that Section 25-2.2(g) is similarly devoid because of the lack of objective standards of the clause "or other conditions tending to disrupt the normal operation of the airport." See Fernandes, 663 F.2d at 631 ("standard of `good reason' is indefinite and does not comport with the constitutional requirement that discretion in public officials be specifically and narrowly circumscribed"); Shuttlesworth v. City of Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (invalidating ordinance which empowered a public official to deny a parade permit if, in his opinion, the proposed parade would be detrimental to the "public welfare, peace, safety, health, decency, good order, morals or convenience" on grounds that discretion was not narrowly circumscribed); Rochford, 585 F.2d at 268-269 (the phrase "persons authorized by law" allowed airport officials to exercise discretion in granting or denying a "permit" application on the basis of their interpretation of which persons are "authorized by law" to engage in protected activities; therefore, the regulations were facially void on their face for vagueness because they failed to include the requisite standards necessary to guide those officials, and because it operated as a prior restraint on the exercise of First Amendment rights) (citing Kunz v. New York, 340 U.S. 290, 294, 71 S.Ct. 312, 315, 95 L.Ed. 280 (1951)).
However, the Rochford Court overruled the district court's finding that the part of the regulation which permitted the airport manager or his authorized representative to declare an emergency because of unusually congested conditions or the necessity of taking emergency security measures was "uncertain in meaning" and "devoid of guiding standards." 585 F.2d at 270. "The [district] court reasoned that this meant that too much discretion was vested in the airport official whose action could result in an invalid restriction of First Amendment freedoms." Id. The Court, finding the provision sufficiently narrow and definite to be a permissible limitation of First Amendment activities, agreed with the City who argued "that the terms of the provision [we]re not vague, and that if there is unusual congestion or an emergency security situation, those charged with the responsibility of operating the airport must have flexibility to insure the public safety and welfare." Id. This Court fully agrees with that rationale and, accordingly, rejects Plaintiffs' argument on this ground. See also Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) (upholding narrowly drawn permit system although it sanctioned denial of permit if proposed activity would interfere with the public convenience to use the city streets).

III. PROCEDURAL DUE PROCESS
Plaintiffs argue that Chapter 25 fails to include the necessary due process procedural safeguards as required in Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 *938 L.Ed.2d 649 (1965). They argue that Chapter 25 fails to address the procedures regarding the granting or denial of permits, revocations, renewals, or appeals; and that there exists no provisions regarding time limitations governing judicial review and the burdens of proof thereof. (See Plaintiffs' Complaint, DE 1, Paragraphs 42-45.)
"If a regulation has the potential to impinge upon First Amendment rights, that regulation must provide for procedural due process.... Prompt notice and review proceedings must be included in the regulations themselves." Rochford, 585 F.2d at 272. The "touchstone" of procedural due process is "protection of the individual against arbitrary action of government." Wolff v. McDonnell, 418 U.S. 539, 558, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974).
While the fundamental requirement of procedural due process is the opportunity to be heard "at a meaningful time and in a meaningful manner," Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965), "... due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). "The goal of procedural due process analysis is to determine whether a state has provided adequate procedures to minimize efficiently the risk of arbitrary or erroneous deprivations of life, liberty, or property. In pursuing this goal, however, courts must also take into account society's interest in the efficient administration of government." "Determining the process due in a particular situation is a weighing process." Burgess v. Miller, 492 F.Supp. 1284, 1290 (N.D.Fla.1980) (citing Board of Regents of State Colleges v. Roth, 408 U.S. 564, 570, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972)). "Only the constitutional minimum is guaranteed. And that minimum is any reasonable procedure appropriate to the circumstances which fairly protects an individual from arbitrary action." Id. (citations omitted); see also Thibodeaux v. Bordelon, 740 F.2d 329, 338 (5th Cir.1984) ("Due process does not require perfect process.")
Because Chapter 25 contains no procedural safeguards, the Court finds that due process is violated and, therefore, does not need to reach the issue of whether the airport officials had unbridled discretion in administering the regulations. Rochford, 585 F.2d at 272; see also Entertainment Concepts, Inc., III v. Maciejewski, 631 F.2d 497 (7th Cir.1980) (Court held village ordinance unconstitutionally insufficient for providing penalties of suspension or revocation of license without sufficient procedural due process); Gascoe, Ltd. v. Newton Tp., Buck County, 699 F.Supp. 1092 (E.D. Pa.1988) (Court held municipality's entire prohibition of adult films unconstitutional for failing to institute procedural safeguards); Coleman v. Block, 663 F.Supp. 1315 (D.N.D.1987). However, it is up to the Defendants to incorporate the required safeguards. See Freedman, 380 U.S. at 60, 85 S.Ct. at 739.

IV. SOLICITING DONATIONS
Plaintiffs argue that Section 25-2.2(f)'s prohibition of selling items for money, as opposed to soliciting donations in exchange for literature, is unconstitutional. "Charitable solicitation of funds has been recognized by this Court as a form of protected speech." Cornelius, 473 U.S. at 797, 105 S.Ct. at 3446; see also Virginia Pharmacy Board v. Virginia Citizens Consumer Counsel, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); Village of Schaumburg, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); Belsky, 799 F.2d at 1488 ("It is clear that the solicitation of funds is an activity that may receive first amendment protection.") The Fourth Circuit explicitly addressed this issue when it stated:
[P]laintiffs' distribution of literature does not lose first amendment status simply "because the written materials sought to be distributed are sold rather than given away, or because contributions or gifts are solicited in the course of propagating the faith." (citing Heffron, 452 U.S. 640, 647 [101 S.Ct. 2559, 2563, 69 L.Ed.2d 298] (1981). Their message may be different, but street corner *939 pamphleteers are in the mold of Thomas Paine. To treat them as mere commercial actors, relegated to a subordinate role in our constitutional scheme, is to deny an essential part of our political history.
Glover v. Cole, 762 F.2d 1197, 1201 (4th Cir.1985).
The United States Supreme Court, commenting on this point, stated:
[C]haritable appeals for funds, on the street or door to door, involve a variety of speech interests  communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes  that are within the protection of the First Amendment. Soliciting financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease.
Village of Schaumburg, 444 U.S. at 632, 100 S.Ct. at 833; But Cf. Belsky, 799 F.2d at 1489-90 (Eleventh Circuit upheld a federal regulation which prohibited the solicitation of funds in a designated area on postal premises, but which permitted the distribution of literature in the same area, on the ground that activities involving the solicitation of funds (e.g., making correct change or providing a receipt) can require an extended encounter, are inherently more intrusive, and are likely to cause greater disruption to pedestrian traffic flow). However, the Court finds the rationale in the Belsky case unpersuasive to the case sub judice insofar as the MIA permits the solicitation of donations in exchange for literature as this activity is just as intrusive as selling items for money.
Accordingly, Section 25-2.2(f) must be stricken from the Dade County Code as being constitutionally violative of the First Amendment.
Accordingly, the Court having carefully reviewed the merits of Plaintiffs' Motion (DE 18), having recognized that a "court should refrain from invalidating more of a statute than is necessary" and "administrative regulations should be similarly construed to preserve their constitutionality, as far as possible, when a portion of the regulations is found unconstitutional and may be severable without otherwise disrupting the regulations' functions," United States v. Rainbow Family, 695 F.Supp. 294, 312 (E.D.Tex.1988), and having reviewed the entire court file, it is
ORDERED AND ADJUDGED as follows:
1. Plaintiffs, International Caucus of Labor Committees and Robert Robinson's, Motion For Preliminary Injunction (DE 18) be and the same is hereby DENIED;
2. The prayers for relief in Plaintiffs' Complaint (DE 1) be and the same are hereby GRANTED in part and DENIED in part as follows:
a) The portion of Section 25-2.2(d) which provides: "nor shall such activity prevent, impede, interfere with, hamper or curtail the conduct of business at the airport," is unconstitutionally vague under the due process clause and, therefore, is hereby stricken from Chapter 25, Dade County Ordinance;
b) Section 25-2.7(a), because of the language "persons lawfully entitled thereto," is unconstitutionally vague under the due process clause and, therefore, is hereby stricken from Chapter 25, Dade County Ordinance;
c) Section 25-2.2(f) is hereby stricken from Chapter 25, Dade County Ordinance, because "[P]laintiffs' distribution of literature does not lose first amendment status simply `because the written materials sought to be distributed are sold rather than given away, or because contributions or gifts are solicited in the course of propagating the faith.'" Glover, 762 F.2d at 1201 (citing Heffron, 452 U.S. 640, 647, 101 S.Ct. 2559, 2563 (1981);
d) Defendant is ordered to amend its regulations to conform with the due process requirements for adequate procedural *940 safeguards of Freedman v. Maryland and its progeny;
e) Defendants shall incorporate the necessary procedural safeguards into Chapter 25 within ninety (90) days from the date of this Order or the Court will consider striking Chapter 25 in its entirety. Freedman, 380 U.S. at 60, 85 S.Ct. at 739; and
f) The remainder of the prayers for relief in Plaintiffs' Complaint (DE 1) be and the same are hereby DENIED; and
3. The above-styled cause be and the same is hereby DISMISSED.
DONE AND ORDERED.

*941 EXHIBIT A